Filed 5/29/15  Certified for publication 6/8/15 (Order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----

| | |
|---|---|
| CITY OF BRENTWOOD, | C076343 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2013-80001568-CU-WM-GDS) |
| v. | |
| ROBERT R. CAMPBELL, as Auditor-Controller, etc., | |
| Defendant; | |
| MICHAEL COHEN, as Director, etc., | |
| Real Party in Interest and Respondent. | |

This appeal represents the latest fallout in this court[1] of the shake-up in the status quo from the "Great Dissolution" legislation enacted in 2011 (and amended in 2012) that abolished the nearly 400 redevelopment agencies in California for reasons of financial

---

[1] This is by virtue of the Legislature's designation of Sacramento County Superior Court as the venue for "any action contesting the validity" of this legislation.  (Health & Saf. Code, § 34168, subd. (a); undesignated statutory references will be to this code.)

1

exigencies. (See *City of Pasadena v. Cohen* (2014) 228 Cal.App.4th 1461, 1462 & fn. 2 (*Pasadena*).) Plaintiff City of Brentwood (Brentwood) filed this petition, in its own right and as the "successor agency" (§§ 34171, subd. (j), 34173) to its former redevelopment agency,[2] for a writ of mandate to dispute administrative rulings of real party in interest Department of Finance (the Department).[3] The Department, in reviewing an audit, determined that "tax increment" distributions[4] the Brentwood redevelopment agency had made to Brentwood before the redevelopment agency's dissolution in February 2012, which were pursuant to five agreements executed *after* January 2011 between Brentwood and its redevelopment agency for various redevelopment projects, were agreements specifically excluded from the definition of "enforceable obligations" (§ 34171, subd. (d)) of a former redevelopment agency. As a result, the Department directed Brentwood to retransfer these amounts to the trust fund that benefits the "taxing entities" (§ 34171, subd. (k)), which, after successor agencies have satisfied former redevelopment agency obligations, are now entitled to distribution of the tax increment under the Great

---

[2] A successor agency is essentially a caretaker empowered only to complete ongoing work pursuant to the former redevelopment agency's enforceable obligations "but without any legal authority to participate [otherwise] in redevelopment activities." (§ 34173, subd. (g).)

[3] The original title in the trial court was both redundant and inaccurate. It named both the Department *and* its director (Michael Cohen, in his official capacity) as defendants, even though only the latter is necessary (*Stockton v. Department of Employment* (1944) 25 Cal.2d 264, 273), and omitted Robert R. Campbell (in his official capacity as Auditor-Controller of Contra Costa County), who had been named in the petition as "real party in interest" (even though he is a *neutral* stakeholder who disclaimed any interest in the outcome of the litigation (§ 34182, subd. (c) [auditor-controllers are administrators of tax-increment trust funds]). We have corrected the appellate caption to read as it does at present.

[4] These are property tax revenues attributable to the increase in value of real property in a redevelopment project, to which redevelopment agencies had previously been entitled. (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 246-247 (*Matosantos*).)

2

Dissolution (§ 34183, subd. (a)(4)) in lieu of the former redevelopment agency. The Department also rejected the inclusion of payments for these projects as enforceable obligations of the Brentwood redevelopment agency in the "Recognized Obligation Payment Schedule" (ROPS) for payments due in July to December 2013 (ROPS IV) that Brentwood had filed as the successor agency. (§§ 34171, subd. (h), 34179, subd. (h)). The trial court denied the petition in April 2014; Brentwood timely appealed.

On appeal, Brentwood contends article XIII, section 25.5, subdivision (a)(7)(A) of the California Constitution[5] precludes the Legislature from retroactively excluding the five agreements at issue from the definition of enforceable agreements. Alternately, it claims that the Legislature did not intend to include these types of agreements in the exclusion, or that the agreements come within an exception to the exclusion for transfers of money in exchange for goods and services. Finally, it argues that the disapproval of the inclusion of payments under these agreements from ROPS IV violates the contractual rights of third party beneficiaries of the agreements, and the Department should also be estopped from disapproving them because previous inclusions of these agreements in an ROPS was not a subject of challenge.[6] We shall affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

This case turns on the legal issue of statutory interpretation. Consequently, even though the parties have supplied an exhaustive record of the nature of the projects that

---

[5] All further references to articles are to the California Constitution.

[6] We have allowed a number of amici curiae to file briefs. While some of the briefing provides food for thought, ultimately we are not persuaded that we should allow the expansion of the issues beyond those as the parties have framed them. (*Matosantos*, *supra*, 53 Cal.4th at p. 242, fn. 2; *Rieger v. Arnold* (2002) 104 Cal.App.4th 451, 461.)

3

underlie the challenged administrative determinations and the path the dispute has taken on the way to the courthouse,[7] the specific underlying facts are mostly immaterial.

Brentwood is the "[s]ponsoring entity" of its former redevelopment agency. (§ 34171, subd. (n).) It established the redevelopment agency in August 1981, designating its city council as the governing board.

The Brentwood redevelopment agency had identified five projects as part of its five-year plan for downtown revitalization as early as 2008. We will take Brentwood at its word (without parsing through the hundreds of pages it cites in the administrative record) that numerous city and redevelopment agency resolutions and budgets between 2008 and 2010 establish that the two entities were "working cooperatively regarding the[se] . . . improvements," including the identification (inter alia) of tax increment as a primary funding source of these projects. Brentwood represents that it received over $8.2 million in "satisfaction of [these] funding commitments" from its former redevelopment agency before 2011 (which are not in issue in this appeal).

However, it was not until February and March 2011 that Brentwood and its redevelopment agency entered into public improvement agreements (PIA's) for each of the five projects to "implement" the cooperation. These obligated the redevelopment agency to reimburse Brentwood for the *costs* the latter incurred in the course of planning and administering the construction of the improvements included in each of the projects, as was the common prior practice. (See § 33445.) The latter two agreements, executed in March 2011, identified the January 2011 gubernatorial announcement of an intent to eliminate redevelopment agencies (*Matosantos*, *supra*, 53 Cal.4th at p. 250) as an impetus for the execution of the PIA's. The total funding obligation to Brentwood was

_____

[7] This included what Brentwood terms an "administrative record," which is in fact an exhibit *it* submitted to the trial court containing a collection of documents it believed were relevant to the dispute.

4

about $34.5 million.  The February 2011 PIA's were amended to restructure the payment schedule.  Beginning in March 2011 and ending on the last day of its existence in January 2012, the Brentwood redevelopment agency made payments to its sponsoring entity of about $15.5 million in cash (and over $4 million in bond proceeds not at issue in this case).**8**

On June 28, 2011, the Legislature enacted the Great Dissolution as an urgency measure effective immediately.  (Assem. Bill No. 26 (2011-2012 1st Ex. Sess.) enacted as Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 5 (hereafter chapter 5X).)  It barred redevelopment agencies from incurring any further obligations as of that date—the "freeze" component—and established procedures (eff. Oct. 1, 2011) that dissolved all redevelopment agencies and wound up their outstanding obligations—the dissolution component.  (*Matosantos*, *supra*, 53 Cal.4th at pp. 250-251; *Pasadena*, *supra*, 228 Cal.App.4th at p. 1463.)  During the freeze, redevelopment agencies were authorized to continue distributing tax increment pursuant to enforceable obligations, the definition of which *included* "sponsor agreements" between a former redevelopment agency and its sponsor agency.  (§§ 34167, subd. (d), 34169, subd. (a)).  Postdissolution, however, the definition of "enforceable obligations" entitled to tax increment from the successor agencies *excluded* all sponsor agreements.  (§§ 34171, subd. (d)(2), 34177, subd. (a).)**9**

---

**8** The *dates* of these payments were March, June, and August 2011, and January 30-31, 2012.  However, the *amounts* of each payment are not clear from the record.

**9** Section 34171, subdivision (d)(2) provides:  "For purposes of this part, 'enforceable obligation' does not include any agreements, contracts, or arrangements between the city, county, or city and county that created the redevelopment agency and the former redevelopment agency.  However, written agreements entered into (A) at the time of issuance, but in no event later than December 31, 2010, of indebtedness obligations, and (B) solely for the purpose of securing or repaying those indebtedness obligations may be deemed enforceable obligations for purposes of this part.  Notwithstanding this paragraph, loan agreements entered into between the redevelopment agency and the city,

*Matosantos* ultimately rejected constitutional challenges to chapter 5X.[10] (*Matosantos*, *supra*, 53 Cal.4th at p. 242.)  Because the Supreme Court had issued a stay of the dissolution and windup procedures in chapter 5X, *Matosantos* judicially reformed various deadlines, in particular the designation of February 1, 2012, as the new operative date for dissolution.  (*Matosantos*, at pp. 274-275.)

As part of a 2012 enactment that amended the Great Dissolution legislation effective June 27, 2012, section 34179.5 imposed a new audit responsibility on successor agencies as part of their duty to account for unobligated tax increment revenues available for transfer to taxing entities.  (See Assem. Bill No. 1484 (2011-2012 Reg. Sess.) adding Stats. 2012, ch. 26, §§ 17, 40 (hereafter chapter 26).)  Pursuant to the statute, successor agencies were required to engage in an audit of former redevelopment agency accounts as part of a "due diligence review."  (§ 34179.5, subd. (a).)  This review, as is pertinent to this appeal, was to identify "The dollar value of *any cash . . . transferred after January 1, 2011,* through June 30, 2012, by the redevelopment agency or the successor agency to [a sponsoring entity] and the purpose of each transfer."  (*Id*., subd. (c)(2), italics added.)  Under section 34179.6, the successor agency was to submit the results of this audit to the oversight board[11] by December 2012 for the latter's approval by January 2013.  The

county, or city and county that created it, within two years of the date of creation of the redevelopment agency, may be deemed to be enforceable obligations."

[10]  A companion measure would have allowed redevelopment agencies to continue in operation if the sponsoring entities "paid to play" with disbursements into funds for the benefit of the taxing entities.  (Assem. Bill No. 27 (2011-2012 1st Ex. Sess.) enacted as Stats. 2011, 1st Ex. Sess. 2011-2012, ch. 6 (hereafter chapter 6X); *Matosantos*, *supra*, 53 Cal.4th at p. 241.)  The court determined this would be unconstitutional interference with the operations of ongoing redevelopment agencies.  (*Matosantos*, at p. 242.)

[11]  An oversight board has supervisory power over successor agencies.  It is composed primarily of the representatives of the taxing entities, to which it owes fiduciary duties. (§§ 34171, subd. (f), 34179, subds. (a) & (i).)

Department thereafter had the authority to adjust any amounts included in the review by April 2013.  Upon this determination, the successor agencies had the duty to transmit the funds subject to recovery to the county auditor-controllers (including a diligent effort to recover funds actually transferred without an enforceable obligation to a sponsoring entity) for the latter to disburse to taxing entities.  Section 34179.6 also specified remedies for the failure to remit identified funds.  (*Id*., subd. (h).)

Brentwood, as successor agency, engaged the services of an approved auditor to conduct the required review, which concluded in December 2012 that the payments to Brentwood for the five projects were all pursuant to enforceable obligations executed in February and March 2011.  The oversight board adopted the review and submitted it to the Department in February 2013.  The Department concluded the PIA's were not enforceable obligations because they were sponsor agreements that were excluded from the definition.  (§ 34171, subd. (d)(2).)  After a meet-and-confer session, the Department reaffirmed its determination in May 2013.

Meanwhile, Brentwood had included these redevelopment projects as enforceable obligations in three previous ROPS's with the approval of its oversight board and without any question from the Department, although it was not until ROPS III that Brentwood identified an actual payment due from the tax-increment trust fund for any of them.  For the previous three ROPS's, the Department issued its approvals (with exceptions not pertinent to this appeal), noting however that "An item included on a future ROPS may be denied even if it was not questioned from the preceding ROPS."  After its review of ROPS IV, the Department asserted that payments listed for two of the projects were pursuant to invalid sponsor agreements and it disapproved their inclusion on that basis in ROPS IV.  The Department reaffirmed its determination after a meet-and-confer session.  The present action followed in July 2013, when Brentwood filed its writ of mandate to dispute the Department's administrative actions.

7

In a lengthy and well-reasoned statement of decision, the trial court denied the petition. (That we do not quote from it directly does not detract from the invaluable assistance it has provided in framing the pertinent facts and issues.) It concluded there were not any constitutional impediments to retroactive invalidation of sponsor agreements in the 2012 enactment of the auditing process (which was the unmistakable legislative intent, and which Brentwood conceded was otherwise within the Legislature's power). It further concluded the payments to Brentwood did not come within an exception for goods and services, because the successor agency did not *itself* receive any goods or services in exchange for these payments; they were reimbursement for goods and services for which *Brentwood* had paid third parties. As for the disapproval of the items in ROPS IV, the court rejected an argument that the rights of third party beneficiaries (the contractors for the projects) were impaired, because the agreements (or any other extrinsic evidence) failed to establish an intent to execute the agreements for the benefit of the third parties, or provide any evidence to support a claim that contractors relied on the promised funding. The court also refused to apply estoppel against the Department. (The court additionally rejected three other arguments that Brentwood does not renew on appeal.)

## DISCUSSION

### 1.0 The Legislature May Constitutionally Invalidate Predissolution Sponsor Agreements Retroactively After Having Abolished Redevelopment

#### 1.1 *Matosantos* and Chapters 5X and 6X

Before we delve into Brentwood's argument, we must perforce provide a brief digest of the holding in *Matosantos*, *supra*, 53 Cal.4th 231. As noted above, at issue was the constitutionality of the freeze and dissolution components of chapter 5X (div. 24, pts. 1.8 & 1.85 of the Health & Saf. Code), and the pay-to-play provisions of chapter 6X (div. 24, pt. 1.9 of the Health & Saf. Code).

8

Being "political subdivisions of the state," and "creatures" of *statutory* genesis (*Matosantos*, *supra*, 53 Cal.4th at p. 256), redevelopment agencies are subject to the principle that "the legislative power to make new laws [embraces] the power to abrogate existing ones. What the Legislature has enacted, it may repeal." (*Id.* at p. 255.) Thus, "barring some specific constitutional obstacle," redevelopment agencies can exercise only the authority that the state confers upon them and can be dissolved. (*Ibid.*) This legislative plenary power is not constrained under the constitutional provision expressly authorizing the funding of redevelopment agencies with property tax increment *if* the Legislature *chooses* so to fund them (*id.* at pp. 256-258); "the Legislature may extend that authorization . . . [and] it may limit or withdraw that authorization . . . without violating article XVI, section 16." (*Matosantos*, at p. 258.) The addition of article XIII, section 25.5, subdivision (a)(7)(A), to prohibit legislative redirection of tax increment, also did not constrain plenary legislative power over the existence of redevelopment agencies: "[A]lteration of a local government entity from a statutory creation existing only at the pleasure of the [Legislature] to a constitutional creation with life and powers of independent origin and standing . . . would represent a profound change in the structure of state government," and it "would be unusual in the extreme for the people . . . to adopt such a fundamental change only by way of implication . . . ." (*Matosantos*, *supra*, at p. 260.) As a result, "we [do not] discern [any] constitutional impediment to the Legislature's electing to dissolve the state's redevelopment agencies under part 1.85 of division 24 of the Health and Safety Code." (*Matosantos*, at p. 262.)

As for the freeze on further activity, "The power to abolish an entity necessarily encompasses the incidental power to declare its ending point"; consequently, if article XIII, section 25.5, subdivision (a)(7)(A) was not intended to restrict the power to abrogate redevelopment agencies, it did not intend to restrict the "ability to decide *when* redevelopment agencies could cease to exist as legal entities or *at what point, as part of*

*winding up and dissolving*, they would be relieved of the ability to make new binding commitments and engage in new business." (*Matosantos*, *supra*, 53 Cal.4th at pp. 262-263, italics added.) The article XIII provision "is best read as limiting the Legislature's powers *during the operation*, rather than the dissolution, of redevelopment agencies." (*Matosantos*, at p. 263, italics added.) The freeze thus "exercises the Legislature's constitutional power to authorize . . . tax increment revenue . . . , or to withdraw that authorization from, redevelopment agencies." (*Matosantos*, at p. 263.) For this reason, the article XIII provision "does not invalidate the freeze portions of [division 24, part 1.8 of the Health and Safety Code] as they apply to dissolving redevelopment agencies." (*Matosantos*, at p. 264.)

On the other hand, the Legislature could not condition the continued existence of redevelopment agencies on compliance with legislative redirection of their tax increment in division 24, part 1.9 of the Health and Safety Code. This is contrary to the unambiguous text of the article XIII provision and the historical context of its enactment. (*Matosantos*, *supra*, 53 Cal.4th at pp. 264-267.)

1.2     *Matosantos* and Chapter 26

Seizing upon the language in *Matosantos* that the Constitution prohibits redirection of tax increment *during the operation* of redevelopment agencies, Brentwood argues that until the redevelopment agencies closed their doors on February 1, 2012, the Legislature did not have the power constitutionally to redirect tax increment already allocated to a redevelopment agency by retroactively invalidating all sponsor agreements executed after January 1, 2011, and reclaiming the payments made to the sponsor agency pursuant to them.[12] However, "the interpretive principle of ratio decidendi requires that

---

[12] Brentwood concedes that neither redevelopment agencies nor their sponsors have any vested contractual rights otherwise protected against abrogation. (E.g., *Mallon v. City of Long Beach* (1955) 44 Cal.2d 199, 209.) Its sole challenge to the retroactive invalidation

10

we view the scope of a holding through the lens of the underlying facts." (*DeVore v. Department of California Highway Patrol* (2013) 221 Cal.App.4th 454, 461 (*DeVore*).) The "factual" context of *Matosantos*'s constitutional analysis involved drawing a distinction between the freeze and dissolution of redevelopment agencies or their *continued* open-ended operations subject to distribution of tax increment in legislatively directed fashion. The language on which Brentwood relies was *not* expressed in a context of considering the scope of legislative power over redevelopment agencies that are instead marked for dissolution.

Furthermore, the distinction in the definition of enforceable agreements at the time of the *Matosantos* ruling (which includes sponsor agreements during the freeze period but excludes them after dissolution) did not play any express or necessarily implied part in *Matosantos*'s analysis of the freeze component, and thus hardly represents "the constitutional compromise that saved [chapter 5X] from invalidation," as Brentwood argues. As for *Matosantos*'s reaffirmation of the "conditional" right of redevelopment agencies to tax increment to the extent of existing indebtedness (*Matosantos*, *supra*, 53 Cal.4th at p. 264), this principle does not inform the analysis of whether the Legislature was entitled to reduce the amount of legitimate indebtedness in the first place through the abrogation of sponsor agreements.

We also do not find persuasive the Department's assertion that *Matosantos* "affirmed" a somewhat analogous power of the state Controller to invalidate *asset* transfers retroactively that both occurred after January 1, 2011, and were not a result of a legitimate contractual obligation. (§ 34167.5.) Simply because this provision is *part* of chapter 5X does not mean *Matosantos* gave its imprimatur to a procedure that it neither expressly nor necessarily considered. (*DeVore*, *supra*, 221 Cal.App.4th at p. 461.)

---

of sponsor agreements rests on the article XIII provision as interpreted in *Matosantos*, *supra*, 53 Cal.4th 231.

11

This leaves us to prognosticate the side of the constitutional divide on which our Supreme Court would place the present exercise of legislative power. The "End of Redevelopment As We Knew It" (ERAWKI) took place on October 1, 2011 (though because *Matosantos* invalidated the lifeline that the Legislature had proposed, it gave the condemned agencies until February 1, 2012, as a matter of judicial reformation, to get their affairs in order). The 2012 audit process represents a legislative rethinking in light of the resulting scurry on the part of sponsors and their conjoined redevelopment agencies in response to the announced intention in January 2011 to overturn their lucrative apple cart.[13] *Matosantos* held plainly that the power to abolish encompassed the power to designate the points at which redevelopment agencies ceased to exist as legal entities *and* would cease to have the power to make new binding commitments. If in retrospect the facts on the ground demonstrated to the Legislature the need to have abrogated the authority to enter into sponsor agreements from the moment that ERAWKI was foretold, rather than October 2011 (or *Matosantos*'s further extension of the window until February 2012) because redevelopment agencies and sponsors would make the unanticipated choice to commit hara-kiri through a challenge to chapter 6X's lifeline (and thus frantically sought to lock up tax increment revenues before ERAWKI), this retroactive invalidation would appear to come within the Legislature's plenary authority to dictate the manner in which redevelopment agencies come to their end.[14]

---

[13]  The share of property taxes statewide dedicated to redevelopment rose from 2 percent in 1977 to 12 percent in 2008. (Legis. Analyst's Off., The 2012-[20]13 Budget: Unwinding Redevelopment (Feb. 17, 2012) p. 6 (hereafter Unwinding Redevelopment).) The trial court took judicial notice of this report. (*Kaufman & Broad Communities, Inc. v. Performance Plastering, Inc.* (2005) 133 Cal.App.4th 26, 32 [such reports proper subject of judicial notice in connection with legislative intent].) Since it was already part of the record, we have denied as unnecessary Brentwood's request to take judicial notice of it.

[14]  As the Legislative Analyst noted, "During the legislative debate over redevelopment, many [redevelopment agencies] took actions to transfer or encumber assets and future tax

12

Thus, the situation is not as Brentwood would characterize it: The Legislature is not attempting to impose a redistribution of tax increment on redevelopment agencies that had open-ended operations. Had the Legislature been willing to "[c]ry 'Havoc,' and let slip the dogs of war" (Shakespeare, Julius Caesar, act III, scene 1, line 1501), it could have immediately dissolved redevelopment agencies without a freeze period (as chaotic as that would have been) in response to the original proposal from the Governor, which missed the necessary two-thirds margin by a single vote in March 2011 (see Unwinding Redevelopment, *supra*, at p. 9), and invalidated sponsor agreements as of that date. Nothing in *Matosantos* would have prevented this action. The Legislature's choice to do so with retroactive wisdom is therefore equally constitutional because it does not reflect redirection of tax increment in the coffers of a viable redevelopment agency of indefinite existence. We thus turn to Brentwood's statutory arguments.

**2.0 The Legislature Intended to Abrogate Sponsor Agreements Retroactively**

While we accord at least "weak deference" to an agency's interpretation of its governing statutes where its expertise gives it superior qualifications to do so (in contrast with the "strong deference" standard in other jurisdictions), the issue is one ultimately subject to our de novo review. (*County of Sonoma v. Cohen* (2015) 235 Cal.App.4th 42, 47 (*Sonoma*).)

---

increment revenues in case the Governor's proposal, or something similar, was enacted," resulting in a rush to issue debt and transfer assets to sponsors in transactions that were not at arm's length. (Unwinding Redevelopment, *supra*, at pp. 10-11.) The Legislative Analyst's report highlighted the power of the state Controller to order the return of assets transferred to sponsor agencies after January 2011 without a contractual obligation to do so. (*Id*. at p. 17.) However, it did not recommend any specific extension of a similar power to the Department in connection with sponsor agreements.

13

Brentwood contends the Department has misinterpreted the statutes at issue in its decision to overturn the approved audit. We will attempt to unravel the twisted skein of its claim.

2.1     Redevelopment Agency Transfers for Goods and Services Do Not Include the Reimbursement of a Sponsor for Such Payments to Third Parties

In pertinent part, section 34179.5 provides:

"(a) In furtherance of [its duty to remit the unencumbered balances of former redevelopment agency accounts for redistribution to taxing entities (§ 34177, subd. (d))], each successor agency [shall conduct an audit] to determine the unobligated balances available [for redistribution] . . . ;

"(b) For purposes of this section . . . :  [¶] . . . [¶]

"(2) 'Enforceable obligation' includes [(A)] any of the items listed in [section 34171, subdivision (d)], [(B)] contracts [for] specific work . . . [antedating] June 28, 2011, [between a redevelopment agency and] a third party that is other than [a sponsor agency], and [(C)] indebtedness obligations as defined in [section 34171, subdivision (e)];

"(3) 'Transferred' means the transmission of money . . . that is not in payment for goods or services . . . ;

"(c) At a minimum, the review required by this section shall include . . . : [¶] . . . [¶]

"(2) The dollar value of assets and cash . . . transferred after January 1, 2011, through June 30, 2012, by the redevelopment agency or the successor agency to [its sponsor agency] and the purpose of each transfer. The review shall provide documentation of any enforceable obligation that required the transfer."

14

Brentwood contends the exclusion of transmission of payments for goods or services from this definition of transfer should be interpreted as excluding *only* transfers that were *not* a quid pro quo for legitimate redevelopment purposes, because legislative history reflects this focus[15] and various other California codes give a broad definition to "goods and services." It also notes that the transactions subject to the state Controller's audit of asset transfers did not include those made pursuant to valid sponsor agreements. It thus argues this exception from transfers subject to audit should include *any* payment for goods or services that is pursuant to a valid redevelopment agreement (even payments reimbursing the *other party's* payments for goods and services).

In the first place, we are concerned with giving effect to the specific language of a specific statute, not an overarching policy penumbra. (*Sonoma*, *supra*, 235 Cal.App.4th at p. 48.) Second, it would be odd indeed to extract this legislative intent from the statute's definition of transfer, when—if this were in fact the intent in enacting section 34179.5—it would have been so much more straightforward simply to define "enforceable obligation" by reference to section 34167 rather than section 34171. (See *Matosantos*, *supra*, 53 Cal.4th at p. 261 [invoking principle that drafters of legislation do not hide an " 'elephant[]' " of a major element in an apparently unrelated " 'mousehole[]' "].) Indeed, it would be easy for any sponsor agency to claim reimbursement for expenditures of goods or services, and therefore the exception would eviscerate the explicit exclusion of sponsor agreements from enforceable obligations. Third, Brentwood does not provide authority for importing a definition of goods or

---

[15] In support of this proposition, Brentwood cites in its brief to page 8 of a committee report that it contends is cited in the trial court's ruling. In point of fact, the trial court was citing to the Legislative Analyst's report we have quoted above (Unwinding Redevelopment, *supra*, at pp. 10-11, 17; see fn. 14, *ante*.) We do not find anything on the *cited* page of the committee report (of which we have taken judicial notice at the behest of amicus City of West Covina) that is material, although we will return to its other contents *post*.

services from different codes enacted in different contexts, and even if we *were* to accord the phrase a "broad" definition it still contemplates nonetheless the receipt of *something* in exchange for the transfer of money. Fourth, because the statutory language is not reasonably susceptible to ambiguity, we do not have any cause to consider legislative history. (*County of Sacramento v. Superior Court* (2012) 209 Cal.App.4th 776, 782; *People v. Meyer* (2010) 186 Cal.App.4th 1279, 1283.) Fifth, and finally, the committee report to which Brentwood and amicus City of West Covina have called our attention (Assem. Com. on Budget, Bill Analysis of Assem. Bill No. 1484 (2011-2012 Reg. Sess.) as amended June 25, 2012 (hereafter Budget Bill Analysis)) is not particularly illuminating on the intent with which the Legislature enacted the 2012 audit process, as we next explain.

The 13-page summary of the provisions did note that the Senate (in the process of replacing the original Assembly bill) established an audit obligation for oversight boards to review assets transferred after January 1, 2011, from redevelopment agencies to sponsors to determine if these were required by an enforceable obligation (Budget Bill Analysis, *supra*, at pp. 1-2), although the definition of "enforceable obligation" is not discussed at any point in this summary. The committee's comments observed that "Many [redevelopment agencies], prior to shut down . . . , made expenditures of cash and transferred other cash assets that might in fact be contrary to the provisions of . . . [chapter 5X]. Current law provides for a way to reclaim the assets through actions of the State Controller, however, due to the budget cash shortage the state needs to have these cash assets returned to the successor agency for distribution to the taxing entities sooner than the current process provides for. . . ." (Budget Bill Analysis, at pp. 11-12, com. (1).) To this end, the bill "sets up a process to review financial records and transactions that occurred between the former [redevelopment agency] or the successor agency and other public or private entities that may not have been authorized under the provisions

16

established in [chapter 5X]," and "suspends the 'fire sale' of redevelopment property." (Budget Bill Analysis, at pp. 12-13, coms. 3(a), 4(a).) Nothing in this report indicates an intent to replicate exactly the procedures governing the existing state Controller's audit, in particular the definition of "enforceable obligation" applying to it (since there is a reference only to chapter 5X, which contained *both* definitions).

In short, section 34179.5 exempts only a transfer of money in exchange for a type of good or service from its ambit. As a result, Brentwood must demonstrate that the payment from its former redevelopment agency comes within this definition.

2.2    Brentwood Did Not Provide Any Good or Service
in Exchange for the Payments

Brentwood in passing asserts that it was acting as a manager of redevelopment work for its former redevelopment agency. However, the trial court observed that Brentwood had "fail[ed] to show the payments here were for services it provided to the [***Redevelopment Agency***]. The PIA's are replete with references to paying [Brentwood] for costs [***Brentwood***] will incur, not for services it will provide. Indeed, [Brentwood] acknowledges the PIA's were essentially reimbursement agreements, not services contracts." Brentwood cannot change course on appeal on this factual matter. (*Saville v. Sierra College* (2005) 133 Cal.App.4th 857, 872-873, boldface & italics added.)

Brentwood also asserts *in a footnote* that section 34179.5 does not "contain[ any] requirement that the payment must be made directly to the party providing the good or service." To the extent this argument is even properly tendered (*People v. Carroll* (2014) 222 Cal.App.4th 1406, 1412, fn. 5 [no obligation to address contentions raised in footnotes]), this is a strained and unnatural reading of "in payment for" goods or services.

Admixed in its other arguments on this issue is a claim that the Department abused its discretion because it did not apply the exception for goods or services. Given that we

17

have concluded the exception does not apply, any failure on the part of the Department to give effect to it is not of any moment.

## 3.0 Disapproval of PIA Payments in ROPS IV Was Permissible

### 3.1 The Purported Contractual Rights of Third Party Beneficiaries Are Not an Issue in This Case

Brentwood contends the PIA's "are contracts expressly drafted and intended to benefit third parties." In its view, third parties (essentially the construction contractors) were aware of the intent of the Brentwood redevelopment agency to fund its sponsor's redevelopment projects and relied on this promise of funding in executing contracts with Brentwood. Therefore, it is an unconstitutional impairment of the contractual rights of these third parties to refuse to approve payments to Brentwood to fund these construction contracts.

Even if Brentwood were correct, it does not have standing to litigate this issue. As Hamlet pondered, "What's *Hecuba* to him, or he to *Hecuba*/That he should weep for her?" (Shakespeare, Hamlet, act II, scene 2, lines 1599-1600.) The right to enforce a status as a third party beneficiary accrues to the third party. (Civ. Code, § 1559; see *Souza v. Westlands Water Dist.* (2006) 135 Cal.App.4th 879, 893 [point of doctrine "is to allow a third party to enforce, against a promisor, rights running to the third party"].) Brentwood purports to be "unaware of any case that holds that only third party beneficiaries can assert the doctrine." More to the point, *we* are unaware of any case that allows a promisee to appear in court and vicariously assert the rights of a third party, as opposed to its right to assert its *own* rights under a contract. (See *Diamond Woodworks, Inc. v. Argonaut Ins. Co.* (2003) 109 Cal.App.4th 1020, 1040 [both promisee and third party may enforce rights *against the contractual promisor*].) This would transgress the fundamental principles of standing. "Every action must be prosecuted in the name of the real party in interest . . . ." (Code Civ. Proc., § 367.) This is the person who possesses the right to sue under the substantive law involved; anyone other than a real party in

18

interest lacks standing and is subject to a demurrer for the failure to state a cause of action. (*Redevelopment Agency of San Diego v. San Diego Gas & Electric Co.* (2003) 111 Cal.App.4th 912, 920-921.)

Furthermore, Brentwood has utterly failed to demonstrate that any of its contracts with third party contractors have in fact *been* impaired because it has been unable to pay them (or will be unable to pay them). As a result, it is questionable (even if Brentwood had standing) whether Brentwood has shown that what is in essence nothing more than a request for a declaration regarding third party rights under the PIA's (to apply in the event of a future default) is sufficiently ripe to warrant relief. (See *Steinberg v. Chiang* (2014) 223 Cal.App.4th 338, 343.)

Given the lack of standing or a concrete controversy implicating the impairment of any third party beneficiary's contractual rights, we accordingly decline to address the merits of the issue. Should some third party beneficiary seek to make this argument, we can resolve at that time whether the trial court was correct about the absence of any evidence to satisfy the criteria for creation of a third party interest in the PIA's.

3.2     Estoppel Does Not Apply to the Disapproval of PIA Payments in ROPS IV

The equitable relief of estoppel requires proof that the opposing party was aware of the facts and intended reliance on its conduct (or induced a reasonable reliance), that the party asserting estoppel was ignorant of the true facts, and that the party asserting estoppel in fact relied on the opposing party's conduct to its own detriment; in addition, a party cannot assert estoppel against a government entity if it would nullify a strong rule of public policy. (*Cotta v. City and County of San Francisco* (2007) 157 Cal.App.4th 1550, 1567.)

The logic supporting Brentwood's claim of estoppel is strained. The entirety of the argument on this point asserts that Brentwood "reasonably relied" on the failure of the Department to dispute the listing of PIA projects in ROPS I and II as enforceable

19

agreements (or the inclusion of actual payments made for PIA projects in ROPS III) "to move forward with the projects" (by which we assume Brentwood means it entered into the construction contracts with third parties).

This argument founders on the reasonability of the reliance on the Department's previous failure to raise any objection to the inclusion of PIA projects as enforceable obligations. As noted above, in its previous determination letters involving ROPS I to ROPS III, the Department each time informed Brentwood that past approvals would not prevent it from revisiting the validity of including an item on a future ROPS.[16] If Brentwood had wanted an ironclad guarantee that approval of an enforceable obligation would be ongoing, it had the statutory remedy of petitioning the Department for a "final and conclusive" determination of approval for subsequent payments for that enforceable obligation. (§ 34177.5, subd. (i).) Given the Department's express reservation of rights and the existence of a statutory remedy to achieve the same result as the estoppel, Brentwood now urges, after the fact, that any reliance on its part was not reasonable. Given the absence of this element, we do not need to consider whether application of estoppel in the present case would nullify public policy.

---

[16] Indeed, the Department had reversed itself in a subsequent ROPS in other cases as well. (E.g., *Pasadena*, *supra*, 228 Cal.App.4th at pp. 1463, 1465 [approval in an ROPS I and II is reversed in an ROPS III].)

## DISPOSITION

The judgment is affirmed.  The Department shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)

          BUTZ          , J.

We concur:

         BLEASE        , Acting P. J.

         HULL          , J.

**CERTIFIED FOR PUBLICATION**


# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Sacramento)

----


| | |
|---|---|
| CITY OF BRENTWOOD, | C076343 |
| Plaintiff and Appellant, | (Super. Ct. No. 34-2013-80001568-CU-WM-GDS) |
| v. | |
| ROBERT R. CAMPBELL, as Auditor-Controller, etc., | ORDER CERTIFYING OPINION FOR PUBLICATION |
| Defendant; | [NO CHANGE IN JUDGMENT] |
| MICHAEL COHEN, as Director, etc., | |
| Real Party in Interest and Respondent. | |


APPEAL from a judgment of the Superior Court of Sacramento County, Allen H. Sumner, Judge. Affirmed.

Burke, Williams & Sorensen, J. Leah Castella and Megan A. Burke for Plaintiff and Appellant.

Rutan & Tucker and William H. Ihrke for League of California Cities as Amicus Curiae on behalf of Appellant.

Alvarez-Glasman & Colvin, Arnold M. Alvarez-Glasman and Christopher G. Cardinale for City of West Covina and West Covina Successor Agency as Amici Curiae on behalf of Appellant.

No appearance for Defendant.

Kamala D. Harris, Attorney General, Douglas J. Woods, Assistant Attorney General, Stepan A. Haytayan and Anthony R. Hakl, Deputy Attorneys General, for Real Party in Interest and Respondent.

Orry P. Korb, County Counsel, Danny Y. Chou, Assistant County Counsel, Lizanne Reynolds and Ling Y. Lew, Deputy County Counsel for Auditor-Controller of the County of Santa Clara, the County of Santa Clara, and County of Santa Clara Office of Education as Amici Curiae on behalf of Real Party in Interest and Respondent.


THE COURT:

The opinion in the above entitled matter filed on May 29, 2015, was not certified for publication in the Official Reports.  For good cause it now appears that the opinion should be published in full in the Official Reports and it is so ordered.  There is no change in judgment.


FOR THE COURT:


     BLEASE     , Acting P. J.


     HULL     , J.


     BUTZ     , J.

2