Filed 2/19/21

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| WILLIAM LEE GERWIG, JR., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> STEVE GORDON, as Director, etc., <br><br> Defendant and Respondent. | D076921 <br><br><br> (Super. Ct. No. 37-2018-00039834-CU-WM-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Frederic L. Link, Judge.  Affirmed.

A. P. Zmurkiewicz for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Chris A. Knudsen, Assistant Attorney General, Celine M. Cooper and Elizabeth Vann, Deputy Attorneys General, for Defendant and Respondent.


When the Department of Motor Vehicles (DMV) holds an administrative hearing to consider whether to suspend a driver's license, certain relaxed evidentiary standards govern.  The DMV can usually support its case by relying on an Evidence Code presumption that chemical blood tests were properly conducted, and the results are thus reliable.  As a matter of first impression, we conclude that licensees rebut that presumption only when they cast doubt on the integrity of the test.  It is not enough to show a

violation of governing regulations that has only a tenuous connection to the accuracy of the results. Here, because plaintiff proved a regulatory violation with only an indirect and speculative relationship to the manner in which the blood test was conducted, and thus the reliability of the test results, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff William Lee Gerwig crashed into the back of another vehicle at an intersection. He was thrown from his motorcycle and landed on the asphalt. California Highway Patrol Officer Jacob Rebelo responded to the scene and spoke with Gerwig while he was receiving medical attention. Based on his lethargic responses, the smell of alcohol, and his inability to recall the collision details, Rebelo suspected Gerwig was intoxicated. Gerwig also admitted he had some wine prior to driving. Rebelo arrested Gerwig for violating Vehicle Code section 23152—driving under the influence of alcohol (DUI)—and watched while state-certified phlebotomist Francisco Moreno collected two vials of blood using a nonalcoholic swab to clean the site. Rebelo took the vials himself and entered them into evidence. Test results from Gerwig's blood draw showed a blood-alcohol concentration (BAC) of .25 percent.

Rebelo seized Gerwig's license and gave him notice that the DMV would conduct a review and could suspend his driving privileges. As he was entitled to do, Gerwig requested a hearing on the matter. (Veh. Code, §§ 13558 & 14100.) At that proceeding, the DMV submitted Rebelo's report and the lab report with the BAC test results. Gerwig objected on foundational, hearsay and authentication grounds, but the hearing officer admitted the evidence over the objections.

2

Gerwig's counsel then called an employee of Specimen Specialists of America, Inc. (SSI), the company that dispatched phlebotomist Moreno to draw Gerwig's blood. Through the employee's testimony, counsel demonstrated that certain SSI procedures were out of compliance with state regulations that govern blood test procedures. In particular, Moreno was functionally unsupervised and the manual that SSI provided for phlebotomists had not been approved by a physician and surgeon.

These deficiencies violate certain regulations. Blood samples must be collected in compliance with Vehicle Code section 23158.[1] (Cal. Code Regs., tit. 17, § 1219.1 (hereafter title 17).) Section 23158 specifies the supervision requirements for certified phlebotomy technicians in subdivisions (e) and (g). Of particular relevance here, the statute calls for phlebotomists to operate under procedures and policies approved by a physician and surgeon (*id.,* subd. (e)), and to be supervised by individuals with certain credentials who review the phlebotomist's work on a monthly and annual basis (*id.,* subd. (g)). Either that supervisor or another qualified individual must also be available to consult with the phlebotomist within 30 minutes while the phlebotomist is working. (*Ibid.*)

After eliciting testimony to demonstrate these procedural failings, counsel argued that the test results could not be relied on due to SSI's regulatory violations. In her findings of fact, the hearing officer agreed there was a title 17[2] violation, but still relied on the lab report to conclude that

---

[1]    Undesignated statutory references are to the Vehicle Code.

[2]    "Title 17 establishes the procedures for determining 'the concentration of ethyl alcohol in samples of blood, breath, urine, or tissue of persons involved in traffic accidents or traffic violations.'" (*Hernandez v. Gutierrez* (2003) 114 Cal.App.4th 168, 172; Cal. Code Regs., tit. 17, §§ 1215–1222.2.)

3

Gerwig drove with a BAC at or above .08 percent. Since there was no evidence to suggest that Moreno was unqualified or that there was some particular problem with the blood test, she found no reason to doubt its accuracy.

Gerwig sought writ review.[3] Before the trial court, his counsel developed his legal argument in further detail: (1) in order to rely on the blood test, the DMV was required to lay a foundation for its admission at the hearing; (2) to do so it could rely on the presumption of Evidence Code section 664, which posits official duties are properly performed, but only if the presumption was not rebutted;[4] (3) Gerwig rebutted the presumption by showing violations of title 17; (4) after that, the DMV was obligated to provide an alternative basis for the test's foundation; and (5) because it did not, it was improper for the hearing officer to rely on the test results. Although the trial court agreed that some aspects of title 17 were not

---

[3] Gerwig sued Jean Shiomoto in her official capacity as Director of the DMV and also named the Department. Although it appears to be a relatively common one, the addition of the DMV as a party was an error. (See *City of Anaheim v. Bosler* (2019) 42 Cal.App.5th 603, 606 [naming the Department of Finance in addition to the director was redundant]; *City of Brentwood v. Campbell* (2015) 237 Cal.App.4th 488, 492, fn. 3 [only the director was a properly named party]; *Stockton v. Department of Employment* (1944) 25 Cal.2d 264, 273 [explaining that a director's authority to carry out the actions of his or her department makes the director the only necessary defendant in a suit].) Because Steve Gordon is the current director of the DMV, we list him as the proper defendant and respondent in this appeal. (See *Ortega v. Johnson* (2020) 57 Cal.App.5th 552, 556, fn. 1.) We refer to the DMV throughout as a convenient shorthand for Steve Gordon in his official capacity. (See *Murphey v. Shiomoto* (2017) 13 Cal.App.5th 1052, 1056, fn. 5.)

[4] Evidence Code section 664 provides in relevant part: "It is presumed that official duty has been regularly performed." We refer to this section throughout when we reference the Evidence Code presumption.

complied with, it denied Gerwig relief on that basis since "[t]here was no argument here whatsoever that the test in this case was unreliable; that the machine it tested was unreliable; that the vials that were used were unreliable. Nothing."

## DISCUSSION

Gerwig believes the trial court missed the point of his legal argument. He insists he had no obligation to show the test itself was unreliable, but rather that the DMV was required to demonstrate the contrary—that the results could still be trusted—after it lost the benefit of the Evidence Code presumption (which he rebutted by highlighting the title 17 violations). Although he couches his argument in more granular terms, the key question raised by Gerwig's appeal is whether any violation of the regulations governing blood tests is enough to rebut the presumption. Before addressing this further, we must explain in greater detail how the DMV hearings work and the evidentiary standards that govern them.

1.  *Background: Administrative Per Se Hearings*

The DMV has authority to suspend the license of a motorist over the age of 21 who drives with a blood alcohol percentage of 0.08 or more under a statutory scheme commonly known as the " 'administrative per se' " law. (*Lake v. Reed* (1997) 16 Cal.4th 448, 454 (*Lake*); Veh. Code, § 13353.2 et seq.) The law was adopted to mitigate the danger posed by motorists who have already been arrested for DUI but have not yet been convicted. Because the criminal process is often protracted, this interim period can be lengthy and the concomitant risk to the public significant. (*Lake,* at p. 454.) Administrative suspensions also address situations where the motorist pleads to a lesser offense. (See, e.g., *Coffey v. Shiomoto* (2015) 60 Cal.4th

5

1198, 1205 (*Coffey*) [Plaintiff was charged with DUI but was "allowed to plead to a 'wet reckless,' " a misdemeanor reckless driving offense].)

When the DMV proposes to suspend a license based on a DUI arrest and a chemical test result, the licensee can request an administrative hearing. (§ 13353.2, subd. (c).) At the hearing, "the DMV is required to suspend a person's driving privilege if it determines by a preponderance of the evidence that (1) a peace officer had reasonable cause to believe that the person had been driving a motor vehicle under the influence of alcohol or drugs, (2) the person was placed under arrest, and (3) the person was driving with ' "0.08 percent or more, by weight, of alcohol in his or her blood." ' [Citation] The DMV bears the burden of proof." (*Molenda v. Department of Motor Vehicles* (2009) 172 Cal.App.4th 974, 985 (*Molenda*).)

These hearings operate with relaxed evidentiary standards. Although the DMV bears the burden of proof, it can usually prove up a prima facie case with relative ease when a blood sample was taken from the licensee by submitting two documents: "the sworn statement of the arresting officer and a forensic lab report documenting the results of a chemical test of the driver's blood." (*Petricka v. Department of Motor Vehicles* (2001) 89 Cal.App.4th 1341, 1348 (*Petricka*); see also *Lake, supra,* 16 Cal.4th at p. 467 for a discussion of evidentiary standards at DMV hearings.) This expedited process, which circumvents the authentication, foundation, and hearsay concerns that often accompany evidentiary submissions, is possible because the DMV routinely invokes Evidence Code section 664, which " 'creates a rebuttable presumption that blood-alcohol test results recorded on official forms were obtained by following the regulations and guidelines of title 17 [and] recorded test results are presumptively valid [such that] the DMV is not required to present additional foundational evidence.' " (*Manriquez v. Gourley* (2003) 105

6

Cal.App.4th 1227, 1232; Evid. Code, § 664.) The presumption can, of course, be challenged by a licensee at the hearing, as in this case. If the presumption is rebutted, " 'the burden shifts to the DMV to prove that the test was reliable despite the violation.' " (*Roze v. Department of Motor Vehicles* (2006) 141 Cal.App.4th 1176, 1183.)

When a motorist's license is suspended at a DMV hearing, the licensee can petition for writ review in the Superior Court. The trial court reviews the DMV decision, typically made by a hearing officer (§ 14104.2, subd. (a)), to independently determine " ' "whether the weight of the evidence supported the administrative decision." ' " (*Lake, supra,* 16 Cal.4th at p. 456.) On an appeal challenging the trial court's conclusions as to the weight of the evidence, "we 'need only review the record to determine whether the trial court's findings are supported by substantial evidence.' " (*Id*. at p. 457.) Insofar as the trial court's decision involves an interpretation of law, our standard of review is de novo. (*Molenda, supra*, 172 Cal.App.4th at p. 986.)

These evidentiary principles and standards of review are clear enough from the well-developed caselaw governing DMV administrative hearings. And here we accept the adequately supported factual finding that SSI's noncompliance with certain Vehicle Code requirements violated title 17. (Cal. Code Regs., tit. 17, § 1219.1.) What remains unclear is whether a licensee who shows the kind of title 17 violation at issue in this case— something that does not bear directly on the reliability of a test result—has successfully rebutted the Evidence Code presumption.

2. *To Rebut the Evidence Code Presumption, the Licensee Must Present Evidence of a Title 17 Violation That Bears Some Reasonable Relation to the Reliability of the Test Results.*

In *Davenport v. Department of Motor Vehicles* (1992) 6 Cal.App.4th 133 (*Davenport*), the appellate court considered whether due process principles

7

were offended by the DMV's use of the Evidence Code presumption to establish the reliability of chemical blood alcohol test results, particularly because such a procedure burdens the licensee with rebutting the presumption.  The court held that a licensee's due process rights were *not* violated by this approach, since DMV hearings are "altogether distinct from criminal trials, in which the accused is endowed with an overriding presumption of innocence." (*Id.* at p. 144.)  The court noted that the licensee has an opportunity to be heard at the hearing, and can subpoena individuals and obtain records to rebut the presumption.  It concluded that allowing the DMV to rely on the Evidence Code presumption strikes an appropriate balance between any "hardship to the licensee" and "the urgent public need for an efficient and cost-effective means of removing from the public roadways the menace posed" by those who drive while intoxicated.  (*Id.* at p. 145.)

Nestled in this portion of the court's due process analysis is a sentence that can fairly be read to support Gerwig's position.  After explaining the Evidence Code presumption, the *Davenport* court wrote, "If the licensee shows, through cross-examination of the officer or by the introduction of affirmative evidence, that official standards were *in any respect* not observed, the burden shifts to the [DMV] to prove that the test was reliable despite the violation." (*Davenport, supra,* 6 Cal.App.4th at p. 144, italics added.)  Relying on the "in any respect" clause, Gerwig contends that *any* evidence of a failure to follow regulatory requirements is enough to rebut the presumption and require the DMV to prove the reliability of the test results.  (*Ibid.*)  We must decide whether this "in any respect" language was meant to dispense with any requirement that the regulatory violation have a reasonable connection to the reliability question.

8

a.      *The focus and scope of the* Davenport *decision*

We begin by observing that the context of *Davenport'*s "in any respect" language undermines the interpretation suggested by Gerwig.  Immediately before this pronouncement, the opinion explained that "what is actually presumed under Evidence Code 664 is *compliance with statutory and regulatory standards,* which in turn gives rise to an inference of reliability." (*Davenport, supra,* 6 Cal.App.4th at p. 144.)  Given that the court had in mind this "inference of reliability," it seems unlikely that in its very next pen strokes it meant to do away with any nexus between reliability and how the presumption can be rebutted.  Furthermore, as the DMV points out, the question before the court in *Davenport* was *not* the threshold showing required to rebut the Evidence Code presumption.  Thus, the "in any respect" comment is explanatory dicta.  The DMV goes on to argue that implicit in *Davenport'*s explanation is that the "official standards" to which the court refers are regulations that bear some reasonable relation to the reliability of the test results.  To buttress this interpretation, it discusses the two cases cited in *Davenport* to support the quoted statement, emphasizing that neither involved a violation of title 17 bearing no reasonable relationship to the accuracy of the chemical test.  It maintains that the examples chosen by the *Davenport* court impose a necessary limitation on the otherwise broad language.

We agree that these two cases lend more support to the DMV's position than to Gerwig's.  In *Coombs v. Pierce* (1991) 1 Cal.App.4th 568 (*Coombs*), the arresting officer utilized a Kern County breath testing machine to determine the licensee's blood alcohol percentage.  At his DMV hearing, the licensee Coombs demonstrated that the county was not licensed to use the particular instrument with which his breath sample was tested.  (*Id.* at p. 577.)

9

Although he argued the results were consequently incompetent, the hearing officer relied on them anyway. (*Ibid.*) The reviewing trial court affirmed his license suspension, finding sufficient evidence of the device's reliability from its inclusion on a federal register of products generally approved for breath alcohol analysis. In reversing, the appellate court highlighted that the register "fail[ed] to provide the missing foundational proof" because it was "a far cry from showing that the listed models are deemed reliable wherever utilized"—or, more particularly, that it was used reliably in Kern County or in the licensee's case. (*Id.* at p. 578.)

We do not read *Coombs* as supporting the proposition that any violation of governing regulations is enough to rebut the Evidence Code presumption. To the contrary, the court's concern that an entity without a license to use a particular device could misuse it, yielding inaccurate results, is implicit in its analysis. It is also clear from the summary at the end of the opinion that the court thought the license issue actually called the reliability of the test results into question. Appellant Coombs cast doubt on the test's validity when he demonstrated the laboratory was not licensed and authorized to use the device, but did so anyway to conduct the very test that was at issue in the hearing. (*Coombs, supra,* 1 Cal.App.4th at p. 581.) The nexus between his showing and the test's reliability lies there.

Gerwig suggests there is a nexus between approved procedures, appropriate supervision, and the proper conduct of a blood draw.[5] Of course,

---

[5] Although we understand Gerwig's position on this point, it is simply not the case that every requirement in title 17 relates directly to the reliability of a chemical blood test. The regulations span a broad range, and some provisions—such as those mandating that the blood draw site and the outside of the collection vial never be cleaned with alcoholic swabs—are patently connected to the test's reliability. (Cal. Code Regs., tit. 17, § 1219.1, subds. (b) and (d)(1).) Others are not. For example, part of the Vehicle Code

10

on some indirect level he is correct, just as one could say that good nutrition and adequate rest are important to a phlebotomist's job performance. But such factors, without more, are too tenuous to cast doubt on the reliability of the blood test results.

The second case cited in *Davenport*—*People v. Adams* (1976) 59 Cal.App.3d 559 (*Adams*)—is further afield. It did not involve a violation of title 17 in the context of a DMV hearing. Rather, it considered whether breath test results were inadmissible at trial after the defendant demonstrated the laboratory's noncompliance with title 17 maintenance procedures involving calibration for the devices. (*Adams,* at p. 563.) In a holding expressly approved of in *People v. Williams* (2002) 28 Cal.4th 408 (*Williams*),[6] the *Adams* court determined that regulatory noncompliance did

_____

incorporated into title 17 requires phlebotomists to always carry an identification card (ID). (Veh. Code, § 23158, subd. (f).) If a certified technician left her ID at home inadvertently while answering a midnight call, that violation cannot be seriously contended to have affected the blood draw. Another section on proper training for those who administer breath tests mandates that successful students receive a certificate with their name, ID or badge number, their agency, and their instructor. (Cal. Code Regs., tit. 17, § 1221.2.) If a clerical error resulted in the certificate misreporting some of this information for an otherwise properly trained operator, we cannot imagine how that would bear on the reliability of the tests the operator conducts.

[6]    The DMV relies on the *Williams* opinion to support its position, but the case helps the DMV no more than *Adams* helps Gerwig. Just as in *Adams*, *Williams* considered whether regulatory noncompliance regarding a breath test justified a new exclusionary rule at trial and concluded it did not. (*Williams, supra,* 28 Cal.4th at p. 415.) In its analysis, it noted that prosecutors can show their evidence is reliable *either* by demonstrating "compliance with the title 17 regulations or independent proof of [] three elements," specifically, "(1) the reliability of the instrument, (2) the proper administration of the test, and (3) the competence of the operator." (*Williams,* at p. 414, adopting the factors described in *Adams*, *supra*, 59

not mandate a new exclusionary rule. Although following regulations provided a "simplified method" for admitting test results, the People could alternatively show their evidence was competent by "qualify[ing] the personnel involved in the test, the accuracy of the equipment used and the reliability of the method followed." (*Adams*, at p. 567.) And if the evidence was admitted that way, the defendant was "entitled to attempt to discredit the results by showing that noncompliance affected their validity." (*Ibid.*) *Adams* thus rejected the argument that regulatory noncompliance makes test results inadmissible at trial—and did not comment on the precise issue before us. But its rationale, including its commentary on the defendant's right to discredit the results, puts emphasis on the nexus between the regulatory violation and the test's reliability. Under *Adams*, a defendant who has unearthed some evidence of regulatory noncompliance can use that to attack test results—but the persuasive power of the attack will depend on how the noncompliance affected the test.

In short, *Davenport*'s statement in dicta that a regulatory violation "in any respect" is sufficient to rebut the Evidence Code presumption is followed by case citations that do not mandate a rigid and technical reading of this language. And even if we were to accept the statement as authoritative, it is at best unclear whether it was intended to eliminate any required nexus between the violation and the accuracy of the test results. We therefore look to other cases involving title 17 violations at DMV hearings, and find the

---

Cal.App.3d at p. 567.) Although the *Williams* decision discussed evidentiary reliability in general, it did so in the context of a trial, with the full evidentiary submission standards that accompany those proceedings. The *Williams* court did not comment on what type of title 17 violation would be necessary to rebut the Evidence Code presumption at a DMV administrative hearing.

caselaw is concerned with whether the licensee demonstrated there was a reason to doubt the reliability of the test.

> b.  *Other relevant caselaw confirms that the claimed regulatory violation must relate to the reliability of the test results.*

We find some guidance for the question before us in other cases that have considered similar arguments.  Of foundational importance to our task is the decision in *Petricka, supra,* 89 Cal.App.4th 1341.  There, the licensee objected to the admission of the officer's sworn statement and his blood test results at his administrative hearing, but (unlike this case) submitted no evidence challenging the test results or demonstrating noncompliance with title 17.  (*Petricka*, at p. 1346.)  Petricka's reliance on his objection alone to undermine the Evidence Code presumption convinced the trial court, but not the court of appeal.  The reviewing court stated that the presumption "applie[d] and satisfied the DMV's initial burden of proof," adding that "[t]he burden then shifted to Petricka *to show that the officer did not carry out his official duties, including that proper procedures for blood collection were not followed.*" (*Id.* at p. 1350, italics added.)  Here, the title 17 violations argued by Gerwig and found by the hearing officer do not show any errors of practice or procedure by the officer or the phlebotomist with respect to the collection or testing of Gerwig's blood sample.

Similarly supportive of our conclusion is the reasoning of two cases in which the appellate court concluded that the licensee *had* successfully rebutted the Evidence Code presumption and shifted the burden back to the DMV to prove the reliability of the test results.  *Freitas v. Shiomoto* (2016) 3 Cal.App.5th 294 (*Freitas*) and *Najera v. Shiomoto* (2015) 241 Cal.App.4th 173 (*Najera*), both relied on by Gerwig, involved the same laboratory error: potential misuse of a dual chamber gas chromatography device.  The licensees called the same expert witness in both cases.  She testified that

13

their lab results, which recorded readings from only one chamber of the machine, indicated the lab was relying on one data point (from a single chamber) when it needed to compare two (from both chambers) to yield accurate results. In both cases, the court of appeal concluded that the witness rebutted the Evidence Code presumption and shifted the burden back to the DMV to show the results were reliable despite the missing data from the device's second chamber. (*Freitas,* at p. 303; *Najera,* at p. 184.) Interestingly, *Freitas* analyzed the lab mistake as noncompliance with state regulations, which mandate that "blood-testing method[s] must be capable of alcohol analysis adequate for enforcing the law"—a requirement that single chamber gas chromatography can never meet. (*Freitas,* at p. 302; Cal. Code Regs., tit. 17, § 1220.1, subd. (a)(2).) *Najera* did not consider the lab's mistake a violation of title 17, but the result was the same; because the second chamber issue made reliance on the blood test dubious, the DMV failed to satisfy its burden of proving that the test results were accurate. This varied analysis of substantially the same laboratory problem highlights that the reliability of the test is the paramount concern in rebutting the Evidence Code presumption.[7]

_____

[7]    The caselaw is further scattered with comments that emphasize substantive reliability in analyzing the import of regulatory violations. (See *Baker, supra*, 81 Cal.App.4th at p. 1174 [" '[T]he purported "flaw" does not break the chain of custody at all, there can be no reasonable basis for inferring that the blood sample was somehow contaminated or tainted.' "]; *Delgado v. Department of Motor Vehicles* (2020) 50 Cal.App.5th 572, 579 (*Delgado*) ["[In other cases] there was affirmative evidence that the test was not conducted or reported properly. No such evidence exists here."]; *Imachi v. Department of Motor Vehicles* (1992) 2 Cal.App.4th 809, 817 ["Accordingly, faced with a report of chemical test results, the burden would be on the licensee to demonstrate that the test was not properly performed."]; *Coffey, supra,* 60 Cal.4th at p. 1206, fn. 8. ["[T]est results are presumptively valid."]; *McKinney v. Department of Motor Vehicles* (1992) 5 Cal.App.4th 519, 525

Gerwig attempts to analogize his case to *Freitas* by positing that a phlebotomist can be improperly "used," just like a dual chamber gas chromatography device, if he or she is not properly supervised. But this forced comparison breaks down precisely due to the difference in reliability. The dual chamber device in *Freitas* and *Najera* gave demonstrably inaccurate readings when it was not used as intended. In contrast, the phlebotomist in this case (Moreno) is a person who presumably conducts blood draws, which he is trained to do, in the same way regardless of the general supervision he receives. While an unsupervised phlebotomist could make a mistake, so too could a properly supervised one. There is nothing here to suggest a mistake was made, nor is there any indication that the particular circumstance of Gerwig's blood draw presented a problem the lackluster supervision structure at SSI left Moreno ill equipped to address.[8]

In summary, although a literal reading of a single sentence in *Davenport*'s dicta might facially support Gerwig's argument, the caselaw weighs heavily in favor of the DMV's position. We decline to read this

["Given the statutory presumption that official duty has been regularly performed (Evid. Code, § 664), the burden was on the person challenging the result [] to show that there was some irregularity in the administration of the test such as would bring into question the reliability of the [blood alcohol level] readings."]; *Morgenstern v. Department of Motor Vehicles* (2003) 111 Cal.App.4th 366, 374 ["[T]he flaw in this argument is that it appears to assume the focus of Evidence Code section 664 is on the officer's duty to fill out the form DS 367, rather than the officer's performance of his duties to properly conduct the breath test with properly functioning equipment."].)

[8] The result might be different if, for example, the phlebotomist testified that he tried unsuccessfully to reach a supervisor by phone to ask a question concerning Gerwig's blood draw. (See § 23158, subd. (g) [A supervisor "shall be accessible to the location where the technician is working to provide onsite, telephone, or electronic consultation, within 30 minutes when needed."].)

sentence in isolation, ignoring the surrounding caselaw that gives it necessary context and meaning.  Here, the type of title 17 violation highlighted by Gerwig "shows no more than a mere possibility that the integrity of the sample was not maintained.  Such speculation is insufficient to support a reasonable inference that the integrity of the sample was, in fact, compromised." (*Baker, supra,* 81 Cal.App.4th at p. 1174.)  In line with the general principle that the licensee's attempt to rebut the Evidence Code presumption " 'cannot rest on speculation,' " we conclude that showing *any* violation of title 17 is not sufficient in and of itself.  (*Delgado, supra,* 50 Cal.App.5th at p. 577; *Petricka, supra,* 89 Cal.App.4th at p. 1348.)  The licensee must present some evidence that the demonstrated violation gives rise to a reasonable inference that the test results are unreliable.

DISPOSITION

The order denying the petition for writ of mandate is affirmed.  Gerwig will bear costs on appeal.


DATO, J.

WE CONCUR:


McCONNELL, P. J.


IRION, J.

16