Filed 8/11/20; Certified for Publication 9/9/20 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF BRENTWOOD et al., | C086344 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2016-80002498-CU-WM-GDS) |
| v. | |
| DEPARTMENT OF FINANCE et al., | |
| Defendants and Respondents. | |

This case involves another effort by the City of Brentwood (Brentwood) to obtain reimbursement for construction costs incurred in five redevelopment projects. In *City of Brentwood v. Campbell* (2015) 237 Cal.App.4th 488 (*Brentwood I*), we rejected Brentwood's contention that a statutory exception to the redevelopment dissolution statutes allowed the city to retain funds previously reimbursed under five public improvement agreements (PIA's) between Brentwood and its former redevelopment agency (RDA). (*Id.* at pp. 500-505.) In this case, Brentwood seeks payment for expenses as yet unreimbursed, contending that the PIA's are "enforceable obligations" under

1

Health & Safety Code section 34191.4, subdivision (b)(1),[1] a 2015 amendment to the dissolution statutes.  Under section 34171, subdivision (d)(2), a reimbursement agreement between a city and a former RDA would not be an enforceable obligation.  The amendment created an exception for a "loan agreement" (§ 34191.4, subd. (b)(2)), defined to include an agreement "under" which the city "contracted with a third party on behalf of the former redevelopment agency for the development of infrastructure" and "the former redevelopment agency was obligated to reimburse the city . . . for the payments made by the city . . . to the third party."  (§ 34191.4, subd. (b)(2)(C)(i).)[2]

Brentwood contends that third party construction contracts for the five projects— all but a small fraction of which preceded execution of the PIA's—were "under" the PIA's within the meaning of section 34191.4, subdivision (b)(2)(C)(i).  The trial court

---

[1]  All undesignated statutory references are to the Health & Safety Code.

[2]  Section 34191.4 provides in relevant part:

"The following provisions shall apply to any successor agency that has been issued a finding of completion by the department:  [¶] . . . [¶]

"(b)(1) Notwithstanding subdivision (d) of Section 34171, upon application by the successor agency and approval by the oversight board, loan agreements entered into between the redevelopment agency and the city, county, or city and county that created the redevelopment agency shall be deemed to be enforceable obligations provided that the oversight board makes a finding that the loan was for legitimate redevelopment purposes.

"(2) For purposes of this section, 'loan agreement' means any of the following: [¶] . . . [¶]

"(C)(i) An agreement between the former redevelopment agency and the city, county, or city and county that created the former redevelopment agency under which the city, county, or city and county that created the former redevelopment agency contracted with a third party on behalf of the former redevelopment agency for the development of infrastructure in connection with a redevelopment project as identified in a redevelopment project plan and the former redevelopment agency was obligated to reimburse the city, county, or city and county that created the former redevelopment agency for payments made by the city, county, or city and county to the third party."

2

ruled that "[i]n order for the contracts to have been 'under' the PIAs and on behalf of the RDA, the PIAs needed to already exist." We agree. In this context, "under" means "pursuant to" or "by reason of the authority of," which calls for the construction contracts to follow the reimbursement agreement. The 2015 amendment provides an exception to the general rule that agreements between a city and its former RDA are not "enforceable obligations" where a city has executed third party construction contracts for redevelopment projects in reliance on a prior agreement with its former RDA to reimburse construction costs. That scenario did not occur here. Brentwood adopted resolutions to fund construction of the five projects, entered into construction contracts, and then sought to create reimbursement agreements after the fact in the form of the PIA's.

Brentwood also relies on the principle stated in Civil Code section 1642 that "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." Brentwood argues that (1) the initial cooperation agreement between the former RDA and the city executed in 1981, (2) the findings resolutions mandated by the redevelopment law that the city and RDA adopted for the five projects from 2007 through 2011, (3) the amended and restated cooperation agreement executed in February 2011, and (4) the PIA's executed in February and March 2011, are one agreement that initially arose before the PIA's were executed. In short, Brentwood argues that dozens of documents executed over 30 years constitute one agreement. We disagree. To begin with, Civil Code section 1642 states a contract principle which does not apply to statutory interpretation. Assuming it did, whether multiple documents constitute a single transaction is a question of fact for resolution by the trial court, which we review for substantial evidence. Where the order is silent on the matter, as here, we presume that the trial court made sufficient findings to support the order. Suffice it to say that Brentwood has not carried its burden to overcome that presumption.

3

In a similar vein, Brentwood contends that the PIA's ratified and incorporated the prior cooperation agreement and findings resolutions that predated third party construction contracts. Ratification is an agency doctrine in which an agent's unauthorized act becomes authorized by adoption by the principal, a scenario that also did not occur here. In any event, ratification cannot change the terms of a contract, which is what Brentwood seeks to do. No agreement or resolution prior to the PIA's committed the RDA to reimburse Brentwood for the construction costs of the five redevelopment projects. Ratification cannot import the terms of the PIA's into the cooperation agreement and findings resolutions.

We will affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

We will not again recount the process of dissolution of RDA's in California and the statutes involved, covered in our prior decisions. (*City of Grass Valley v. Cohen* (2017) 17 Cal.App.5th 567, 573-574 (*Grass Valley*); *Brentwood I, supra*, 237 Cal.App.4th at pp. 494-495; *County of San Bernardino v. Cohen* (2015) 242 Cal.App.4th 803, 807-809 (*San Bernardino*); *City of Tracy v. Cohen* (2016) 3 Cal.App.5th 852, 855-856 (*Tracy*).) As we observed in *Grass Valley*, "[g]iven the many RDA cases this court has decided, due to the designation of Sacramento County as the venue for such disputes [citations], its basic implementing mechanisms are well understood by the parties." (*Grass Valley, supra*, 17 Cal.App.5th at p. 573, fn. omitted.)

This appeal concerns the interpretation and application of the 2015 amendment to the dissolution statutes, which included section 34191.4, subdivision (b)(2)(C)(i). We will confine our discussion to matters relevant to that statute, which prompted Brentwood's petition for writ of mandate and this appeal.

4

On August 20, 1981, Brentwood created an RDA and designated the city council as the governing board.[3] (*Brentwood I, supra*, 237 Cal.App.4th at p. 493.)

On September 22, 1981, Brentwood executed a cooperation agreement with its RDA. The cooperation agreement provided that the city "may, but is not required to, advance necessary funds to the [RDA] or to expend funds on behalf of the [RDA] for the preparation and implementation of a redevelopment plan, including, but not limited to, the costs of surveys, planning, studies and environmental assessments for the adoption of a redevelopment plan, the costs of acquisition of property within the project area, demolition and clearance of properties acquired, building and site preparation, public improvements and relocation assistance to displaced residential and nonresidential occupants as required by law."

Brentwood agreed to provide services to the RDA and submit an annual statement of costs incurred by the city in rendering such services. The RDA agreed "to reimburse the City for all costs incurred by the City pursuant to this Agreement . . . ." The agreement also provided that the "obligations of the [RDA] under this Agreement shall constitute an indebtedness of the [RDA]" within the meaning of the redevelopment law.

The cooperation agreement did not refer to any existing or future redevelopment project or any cost incurred or projected in connection with a redevelopment project. In *Grass Valley*, we noted that the trial court aptly called such an agreement, in which "no specific loans or services were identified," an " 'umbrella' " agreement. (*Grass Valley, supra*, 17 Cal.App.5th at p. 575.)

---

[3] Brentwood cites to what it calls an "Administrative Record in Support of Petition for Writ of Mandate" which, as we observed in *Brentwood I, supra*, 237 Cal.App.4th at page 493, footnote 7, regarding similar citations, actually consists of various documents Brentwood submitted as exhibits to the trial court.

From 2008 through 2011, Brentwood and the RDA adopted the findings resolutions for a capital improvement program to include five projects: a parking structure, community center, downtown infrastructure, downtown streetscape, and a city park. Brentwood explains that the resolutions were adopted to make "the required section 33445 findings to *allow* the RDA to reimburse the City for its costs incurred to construct each of the Projects."[4] (Italics added.) All told Brentwood adopted over a dozen resolutions. None of Brentwood's resolutions referred to the cooperation agreement. In the same period, the RDA also adopted multiple resolutions to budget for and fund the capital improvement projects. None of the RDA's resolutions referred to the cooperation agreement.

From January 29, 2007, through November 29, 2011, Brentwood adopted resolutions approving third party construction contracts and executed contracts for the five projects. None of these resolutions referred to the cooperation agreement.

In January 2011 the Governor announced his intention to dissolve the RDA's, leading to the so-called "fire sale" period in which the agencies and their sponsoring cities sought to transfer or encumber assets before the dissolution law went into effect in June 2011. (*Grass Valley, supra*, 17 Cal.App.5th at p. 574 & fn. 2; *Brentwood I, supra*, 237 Cal.App.4th at pp. 499, 502.)

On February 7, 2011, Brentwood and the RDA entered in an amended and restated cooperation agreement (amended cooperation agreement). The amended cooperation agreement provided that "[t]he City agrees to design and cause the construction and installation of and carry out" the redevelopment projects described in an exhibit attached

---

[4] Section 33445 provides that a former RDA with the consent of the city that created it may pay the cost of public improvements if certain determinations are made, including "[t]hat no other reasonable means of financing . . . are available to the community." (§ 33445, subd. (a)(2).)

6

to the agreement, which included estimated costs for the five redevelopment projects. The amended cooperation agreement further provided that the RDA "agrees to reimburse the City the amounts set forth" in the exhibit and that "[t]his Agreement constitutes an indebtedness of the [RDA] incurred in carrying out the project . . . ."

The amended cooperation agreement stated that it "amends and restates the Cooperation Agreement in its entirety. The Cooperation Agreement is of no further force and effect."

Subsequently, in February and March 2011, Brentwood and the RDA adopted resolutions approving a PIA for each of the five projects and executed the PIA's.[5] As we noted in *Brentwood I*, the two PIA's "executed in March 2011, identified the January 2011 gubernatorial announcement of an intent to eliminate redevelopment agencies [citation] as an impetus for the execution of the PIA's." (*Brentwood I, supra*, 237 Cal.App.4th at p. 493.) All of the PIA's, with the exception of the agreement executed in March 2011 for the civic center parking facility, refer to the amended cooperation agreement, and none refer to the original cooperation agreement.

Each PIA stated an amount that the RDA agreed to pay Brentwood on each project for all "costs of planning, development, permitting, project administration, construction and construction management . . . ." Under the PIA's, Brentwood agreed "to cause the construction and installation of and carry out" each project. The PIA's provided that "payments made by [the RDA] under this Agreement constitutes an indebtedness of the [RDA] incurred in carrying out" the projects.

On January 10, 2012, Brentwood adopted a resolution designating the city as the successor agency to the RDA.

On May 29, 2015, this court issued its decision in *Brentwood I*.

---

[5] Brentwood and the RDA also executed amendments to certain of the February PIA's to adjust payment obligations.

7

On December 10, 2015, the Department of Finance (Department) issued a "finding of completion" letter to Brentwood.  "After the Department of Finance issues a 'finding of completion,' meaning the successor agency has complied with the statutes concerning disbursement of the assets of the former redevelopment agency, the loan may be repaid if an oversight board finds it was for legitimate redevelopment purposes."  (*San Bernardino, supra*, 242 Cal.App.4th at p. 809; accord *City of Azusa v. Cohen* (2015) 238 Cal.App.4th 619, 625.)  On January 20, 2016, the oversight board adopted a resolution finding that the PIA's "were made for legitimate redevelopment purposes and approving reinstatement of [these agreements] as enforceable obligations pursuant to" section 34191.4.  The resolution stated that the total principal balance on the PIA's eligible for repayment amounted to $15,476,371.  (§ 34191.4, subd. (b)(2)(C)(ii) [capping the repayment amount per loan agreement at $5 million].)

On January 22, 2016, the Department initiated review of the oversight board's actions pursuant to section 34179, subdivision (h).

On March 2, 2016, the Department disapproved the oversight board's resolution, finding that "the documentation provided by the Agency does not demonstrate that the City contracted with third parties on behalf of the former RDA.  Additionally, the PIAs do not provide that the City would contract with a third party on behalf of the RDA.  Finally, it is our understanding the contracts for construction of the various projects were entered into by the City before the PIAs were created."

Brentwood filed a petition for writ of mandate alleging that the Department abused its discretion in disapproving the oversight board's resolution reinstating the PIA's as enforceable obligations.  Brentwood sought a writ of mandate ordering the Department to approve the oversight board's resolution and to place the five PIA's on the recognized

8

option payment schedule pursuant to section 34191.4, subdivision (b).[6] The Department responded with a general denial and various defenses.

Following briefing by the parties, the trial court issued a tentative ruling and conducted a hearing. The court thereafter received and reviewed additional briefing submitted by the parties and affirmed the tentative ruling.

In its ruling, the trial court rejected the Department's contention that the PIA's did not indicate that Brentwood would contract with a *third party* on behalf of the RDA as required by section 34191.4, subdivision (b)(1)(C)(i). The court relied on language in the PIA's that the city "will '*cause* the construction and installation of and carry out' " the projects as suggesting the city would not itself construct the facilities but hire third parties. (Italics added.)

The court, however, agreed with the Department that construction contracts with third parties could not have been made "under" the PIA's if the contracts pre-dated the PIA's. The court ruled that "[t]o the extent [Brentwood] seek[s] to establish enforceable obligations for construction contracts entered into prior to the execution of the subject PIA, such contracts do not fall within the ambit of subdivision (b)(2)(C)(i)." The court reasoned that "[i]n order for the contracts to have been 'under' the PIAs and on behalf of the RDA, the PIAs needed to already exist."

Brentwood argued that certain third party construction contracts post-dated the PIA's. The trial court noted evidence Brentwood submitted on the issue but declined to make a finding as to the specific amount owed or what specific contracts were executed

---

[6] To pay an enforceable obligation, a successor agency must apply to the Department for approval by including enforceable obligations on a recognized obligation payment schedule (ROPS), which the successor agency submits to the Department. (*San Bernardino, supra*, 242 Cal.App.4th at p. 808; §§ 34177, subd. (l)(2), 34180, subd. (g).) The Department may eliminate any obligation listed on the ROPS. (*San Bernardino, supra*, 242 Cal.App.4th at p. 808; § 34177, subd. (m), 34179, subd. (h), 34180, subd. (g).)

after the PIA's that may be enforceable obligations.  The court remanded the matter to the Department "for consideration of the subject contract evidence."[7]

## DISCUSSION

### *Standard of Review*

" '[W]here the issue is one of statutory construction or contract interpretation, and the evidence is not in dispute, the de novo standard of review applies [citation].' " (*City of Petaluma v. Cohen* (2015) 238 Cal.App.4th 1430, 1438-1439; *People v. International Fidelity Ins. Co.* (2010) 185 Cal.App.4th 1391, 1395.)  Writ of mandate ordinarily reviews administrative actions for abuse of discretion, but here the question is whether the Department correctly interpreted the statute and the relevant agreements, which is subject to de novo review without according deference to the Department.  (*Tracy, supra*, 3 Cal.App.5th at p. 860; but see *Brentwood I, supra*, 237 Cal.App.4th at p. 500 [interpretation is ultimately de novo but "weak deference" is accorded to agency's interpretation of its governing statutes where its expertise gives it superior qualifications to do so].)

Our objective in interpreting statutes is to ascertain and effectuate legislative intent.  (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 269; *San Bernardino, supra*, 242 Cal.App.4th at pp. 816-817; *City of Cerritos v. State of California* (2015) 239 Cal.App.4th 1020, 1034; *Cuenca v. Cohen* (2017) 8 Cal.App.5th 200, 220.)  To do so, we first look to the language itself.  (*Cerritos, supra*, 239 Cal.App.4th at pp. 1034-1035; *Cuenca, supra*, 8 Cal.App.5th at p. 220.)  If the language is clear and unambiguous, there is no need to resort to other indicia of legislative intent.  (*Cuenca*, at p. 220.)  But the "plain meaning" rule does not preclude a

---

[7] Neither Brentwood nor the Department contends on appeal that the trial court erred in remanding this issue to the Department.  (*Grass Valley, supra*, 17 Cal.App.5th at pp. 576-578.)

court from determining if the literal meaning comports with the statutory purpose. (*Ibid.*) Where a commonly used word has more than one meaning, we adopt the one that best serves the statutory purpose, even if the ordinary meaning is enlarged or restricted. (*Ibid.*) If the statutory language is ambiguous or reasonably susceptible to more than one interpretation, we may refer to other indicia of the Legislature's intent, including legislative history. (*Cuenca, supra*, 8 Cal.App.4th at p. 220; *Cerritos, supra*, 239 Cal.App.4th at p. 1035.) " 'Relevant material includes: legislative committee reports [citation]; Legislative Analyst's reports [citation]; and testimony or argument to either a house of the Legislature or one of its committees,' but '[m]aterial showing the motive or understanding of an individual legislator, including the bill's author, his or her staff, or other interested persons, is generally not considered.' [Citation.]" (*Mt. Hawley Ins. Co. v. Lopez* (2013) 215 Cal.App.4th 1385, 1401.)[8]

Whether Civil Code section 1642 applies is a question of fact for resolution by the trial court, which we review under the substantial evidence standard. (*Brookwood v. Bank of America* (1996) 45 Cal.App.4th 1667, 1675; *Versaci v. Superior Court* (2005) 127 Cal.App.4th 805, 815 (*Versaci*); *Pellegrini v. Weiss* (2008) 165 Cal.App.4th 515, 534 (*Pellegrini*).) Ratification is also a question of fact reviewed for substantial evidence. (*Siva v. General Tire & Rubber Co.* (1983) 146 Cal.App.3d 152, 159; *Hale v. Farmers Ins. Exchange* (1974) 42 Cal.App.3d 681, 691, disapproved on another ground in *Egan v. Mutual of Omaha Ins. Co.* (1979) 24 Cal.3d 809, 822, fn. 5.; *StreetScenes v. ITC Entertainment Group, Inc.* (2002) 103 Cal.App.4th 233, 242; *Danning v. Bank of America* (1984) 151 Cal.App.3d 961, 974.) Where the record is silent on the trial court's

---

[8] We granted Brentwood's request for judicial notice of legislative history of Senate Bill No. 107, which added section 34191.4, subd. (b)(2)(C)(i), to the dissolution statutes (Stats. 2015, ch. 325, § 21), including legislative committee reports and transcripts of legislative committee hearings.

11

findings on these issues, as here, we presume the court found all facts necessary to support the order. (*Pellegrini, supra,* 165 Cal.App.4th at p. 534; *Hochstein v. Romero* (1990) 219 Cal.App.3d 447, 451, fn. 4.)

*Section 34191.4*[9]

Under section 34191.4, subdivision (b)(1), "loan agreements" between an RDA and city "shall be deemed to be enforceable obligations provided that the oversight board makes a finding that the loan was for legitimate redevelopment purposes." There is no dispute that Brentwood's oversight board made such a finding.

However, "loan agreement" is defined by this section to include "[a]n agreement between the former redevelopment agency and the city . . . *under* which the city . . . contracted with a third party on behalf of the former redevelopment agency for the development of infrastructure in connection with a redevelopment project as identified in a redevelopment project plan and the former redevelopment agency was obligated to reimburse the city . . . for the payments made by the city . . . to the third party." (§ 34191.4, subd. (b)(2)(C)(i), italics added.)

Brentwood argues that "an action is taken 'under' an agreement if it is made in the context of an agreement, authorized by an agreement, or done in accordance with an agreement." (See Merriam-Webster's Collegiate Dictionary (11th ed. 2003) p. 1363 ["under" defined as "subject to the authority, control, guidance, or instruction of"].) Thus, Brentwood urges that construction contracts did not need to be entered into after the PIA's to be "under" the PIA's.

The Department also offers various synonyms for "under," including some of the same ones as Brentwood, but basically interprets "under" to mean "pursuant to." The

---

[9] As in *Grass Valley*, we discuss the issues in a different order than presented by the appellant. (*Grass Valley, supra*, 17 Cal.App.5th at p. 576.)

Department echoes the trial court's view that for "Brentwood's third-party construction contracts to have been entered into 'under' the PIAs, 'the PIAs needed to already exist.' "

The Department contends its interpretation is not a " 'temporal requirement' " but rather a matter of "sequencing inherent in any contract—to give rise to any obligation, there must first be an underlying agreement." Brentwood reasonably rejoins that whether the Department's "interpretation is referred to as a temporal requirement or a sequencing requirement, [the Department] is clearly asserting that the words 'under' and 'on behalf of' should be construed to mandate a specific timeline of events."

We agree the question is whether the words "under"—and to a lesser extent, "on behalf of"—used in the statute import a timing requirement. We conclude that they do, to the extent, as the trial court held, that construction contracts cannot be "under" a reimbursement agreement (i.e., the PIA's) that has yet to be executed.

"The word 'under' has many dictionary definitions and must draw its meaning from its context." (*Ardestani v. Immigration and Naturalization Service* (1991) 502 U.S. 129, 135 [112 S.Ct. 515, 519].) The statutory context here indicates that the word "under" is most naturally read to mean that third party contracts to build an infrastructure project must be entered into "pursuant to" or "by reason of the authority of" an agreement by the RDA to reimburse the city. (See *National Assn. of Mfrs. v. Department of Defense* (2018) 583 U.S. __, __ [138 S.Ct. 617, 630] [" ' "under" means "subject [or pursuant] to" or "by reason of the authority of" ' "]; see also Black's Law Dictionary (10th ed. 2014) p. 1431 ["pursuant to" defined to be mean "[a]s authorized by; under"]; Garner, Dict. of Modern Legal Usage (2d ed. 1995) p. 896 ["**under** is preferable to *pursuant to* when the noun that follows refers to a rule, statute, contractual provision, or the like"].)

The statute contemplates a circumstance where a redevelopment plan identifies infrastructure projects and an RDA agrees to reimburse the city for the construction costs of the projects. In reliance on that agreement, i.e., "pursuant to" or "by reason of the authority of" that agreement, the city "contract[s] with a third party on behalf of the

13

former redevelopment agency" to build the project. (§ 34191.4, subd. (b)(2)(C)(i).) Had the RDA not agreed in advance to pay for the projects, the city would not have bound itself to construction contracts to build them.[10]

Brentwood acknowledges this reading of "under" in section 34191.4, subdivision (b)(2)(C)(i), by arguing that the cooperation agreement in 1981 established such reliance. "The City would have never undertaken these five redevelopment projects if it had not been authorized to do so and guaranteed reimbursement by the Cooperation Agreement." Brentwood thus designates the cooperation agreement as the "loan agreement" "under which" the city "contracted with a third party." (§ 34191.4, subd. (b)(2)(C)(i).)

However, this court has already rejected the proposition that an "umbrella" agreement like the cooperation agreement constituted a "loan agreement" for purposes of the dissolution statutes. In *Grass Valley*, the city argued that a 1986 agreement with its former RDA provided a basis for 2011 agreements to be enforceable obligations, under an exception in section 34171, subdivision (d)(2), for loan agreements entered within two years of the creation of an RDA. (*Grass Valley, supra*, 17 Cal.App.5th at pp. 582-583.) Grass Valley's umbrella agreement, similar to the cooperation agreement here, "permitted the City to 'advance or expend' funds to the RDA or on its behalf, required periodic statements to the RDA of costs incurred by the City, and required the RDA to use available funds to reimburse the City for all costs incurred. But the 1986 agreement did not reference any specific extant or anticipated projects, nor any 'loan agreements' between the RDA and the City, as contemplated by section 34171, subdivision (d)(2)." (*Grass Valley, supra*, 17 Cal.App.5th at p. 583.) We held that the 1986 agreement was a

---

[10] By contrast, a city that enters into third party construction contracts without a reimbursement agreement with its RDA—on the presumption that the agency will agree to do so because it is controlled by the city—facilitates the abuse that led to the dissolution of RDA's. (*Grass Valley, supra*, 17 Cal.App.5th at p. 573.)

14

" 'so-called agreement[] to agree . . . not [an] enforceable contract[].' " (*Ibid*.; *Daniels v. Select Portfolio Servicing, Inc.* (2016) 246 Cal.App.4th 1150, 1174.)  The "1986 agreement created a structure for how to treat future agreements, but was not a loan under any definition." (*Grass Valley, supra*, 17 Cal.App.5th at p. 583.)

Our analysis in *Grass Valley* applies here.  Brentwood cannot argue that the cooperation agreement created an enforceable reimbursement obligation because Brentwood committed no money to the RDA.  It was only later in the PIA's that Brentwood and the RDA identified the projects and the amounts that the RDA was to pay for them.

Moreover, as the Department points out, Brentwood's oversight board never passed a resolution that the cooperation agreement was an enforceable obligation under section 34191.4, subdivision (b)(2)(C)(i).  The oversight board identified only the PIA's as agreements that Brentwood submitted to the Department for approval as enforceable obligations under the statute.

Brentwood also argues that the legislative history of Senate Bill No. 107 shows that the Legislature's intent was to reimburse a city or county for any third party contract to develop infrastructure for a former RDA, regardless of timing.  We are not persuaded. To begin with, the language of the statute considered in context is not ambiguous and does not require consideration of legislative history.  (*Brentwood I, supra*, 237 Cal.App.4th at pp. 501-502.)

Further, the materials upon which Brentwood relies include identical sentences in two committee reports that "loan agreements" are defined as "[a]n arrangement whereby a third-party developed infrastructure for the former RDA under contract by the sponsoring local government, with a loan amount not to exceed $5.0 million." (Sen. Com. on Budget & Fiscal Review, Report on Sen. Bill No. 107 (2015-2016 Reg. Sess.), amended Sept. 11, 2015, p. 5; Sen. Rules Com., Off. of Sen. Floor Analyses, Analysis of Sen. Bill No. 107 (2015-2016 Reg. Sess.), Sept. 11, 2015, p. 6.)  Brentwood argues that

15

(1) the word "arrangement" indicates an expansive definition of "loan agreements," and (2) past tense in the term "developed infrastructure" indicates that a certain sequence is not mandated.[11] However, as the Department observes, the word "arrangement" never appears in the statutory language. And the words "developed infrastructure" became "development of infrastructure" in the statute, which, if anything, refutes Brentwood's argument that there was no legislative intent for the reimbursement agreement between the city and the former RDA to precede any third party construction contracts.

Brentwood also submits the statement of a representative of the Department at a hearing of the Committee on Budget and Fiscal Review regarding Senate Bill No. 107. He described the proposed expansion of enforceable obligations to include "loans or repayment of costs incurred by Cities for infrastructure-related projects, Public Works type of projects at the local level." Brentwood focuses on his statement that, "if the City could then identify, in their RDA plan, the project that was worked upon and they can show us the agreement and that they entered into a third-party contract with a vendor to perform those services, they would get repaid." The most that Brentwood can draw from this statement is that the Department's representative "never once mentioned an implicit, but unstated, temporal requirement." Brentwood does not explain how "an implicit, but unstated, temporal requirement" would be mentioned. Moreover, there is in fact a sequence in this statement, which refers to an order beginning with identification of a project in the redevelopment plan, followed by a reimbursement agreement, and then third party contracts to build the project. This statement could be interpreted to presage

---

[11] Brentwood makes a similar argument about the use of past tense in the concluding phrase of section 34191.4, subdivision (b)(2)(C)(i), i.e., reimbursement for "the payments *made* by the city, county, or city and county to the third party." (Italics added.) Brentwood argues that "payments made" could include payment of construction contracts entered into before a reimbursement agreement. But the term "payments made" could just as well refer to construction contracts entered into after a reimbursement agreement. This language sheds no light on whether "under" involves a temporal sequence or not.

16

the sequence that the trial court and this court reads in section 31191.4, subdivision (b)(2)(C)(i).

Considering the language of section 34191.4, subdivision (b)(2)(C)(i), in context, the trial court correctly held that a third party construction contract must follow an existing reimbursement agreement for the former to be "under" the latter. To the extent Brentwood entered into third party construction contracts prior to executing the PIA's, in which its former RDA agreed to reimburse construction costs for the five projects, the PIA's are not "enforceable obligations" under the statute.

*Civil Code Section 1642*

Brentwood contends that the "Loan Agreements" are "a series of documents that should be construed as one contract . . . ." By "Loan Agreements," Brentwood means "the Cooperation Agreement, its amendment, the Findings Resolutions, and the PIAs because they were executed by the same parties, relate to the same matters, and were part of the same transactions, and the PIAs expressly incorporated the earlier commitments by reference."[12] Brentwood maintains that "[s]ince the Loan Agreements include funding commitments made by the RDA long before the Construction Contracts were entered, they clearly satisfy [the Department's] temporal requirement."

Civil Code section 1642 provides that "[s]everal contracts relating to the same matters, between the same parties, and made as parts of substantially one transaction, are to be taken together." We observe as an initial matter that contract law does not control

---

[12] To the extent Brentwood suggests that the city's and the RDA's findings resolutions preceded the third party construction contracts that Brentwood executed, the record is to the contrary. These resolutions were adopted to fund the third party contracts. Indeed, the first city resolution regarding funding for the parking, streetscape, and infrastructure projects was adopted on June 12, 2007. By that point, Brentwood had executed three contracts with third parties for the infrastructure, city park, community center and parking projects.

17

questions of statutory interpretation. (*San Bernardino, supra*, 242 Cal.App.4th at pp. 815-818.)

Assuming for argument's sake that Civil Code section 1642 does apply, in *R.W.L Enterprises v. Oldcastle, Inc.* (2017) 17 Cal.App.5th 1019 (*R.W.L. Enterprises*), the court summarized the applicable standards: "Although [Civil Code section 1642] refers expressly to several 'contracts,' the language has been broadened by case law to apply to instruments or writings that are not on their own contracts. [Citations.] Civil Code section 1642 ' "is most frequently applied to writings executed contemporaneously, but it is likewise applicable to agreements executed by the parties at different times if the later document is in fact a part of the same transaction." ' [Citation.]

" 'Whether a document is incorporated into the contract depends on the parties' intent as it existed at the time of contracting.' [Citation.] ' " 'For the terms of another document to be incorporated into the document executed by the parties *the reference must be clear and unequivocal . . . . .*' " ' [Citation.] 'The contract need not recite that it "incorporates" another document, so long as it "guide[s] the reader to the incorporated document." ' [Citation.] To be construed together, the separate instruments must be 'so interrelated as to be considered one contract.' [Citation.]" (*R.W.L. Enterprises, supra*, 17 Cal.App.5th. at pp. 1027-1028.)

Because the record is silent with regard to the application of Civil Code section 1642, we presume the trial court made sufficient findings to support the order, i.e., that Civil Code section 1642 did not apply. (*Pellegrini, supra*, 165 Cal.App.4th at p. 534.) It is Brentwood's burden to show that substantial evidence does not support the order. (*Versaci, supra*, 127 Cal.App.4th at p. 815.)

Brentwood manifestly cannot carry that burden. As discussed above, the cooperation agreement entered into in 1981—the only agreement between Brentwood and the RDA executed before any third party construction contract—is not a "loan agreement," i.e., a reimbursement agreement, under the dissolution statutes. Even

18

assuming the cooperation agreement could qualify as a reimbursement agreement if linked to the five projects, the findings resolutions that Brentwood and the RDA adopted more than 25 years later do not mention the cooperation agreement. Brentwood does not contend that the resolutions were an agreement for the RDA to reimburse the city. As a general matter, resolutions are not agreements. (*San Diego City Firefighters, Local 145 v. Board of Administration etc.* (2012) 206 Cal.App.4th 594, 607 [" ' "A resolution is usually a mere declaration with respect to future purpose or proceedings . . ." ' "].)

After the Governor announced his intention to dissolve the RDA's, Brentwood and the RDA entered into the amended cooperation agreement in February 2011 in an apparent attempt to create a reimbursement obligation with respect to the five ongoing construction projects. The amended cooperation agreement does constitute a "loan agreement" under section 34191.4, subdivision (b)(2), i.e., an agreement by the former RDA to pay the city for the construction costs of identified redevelopment projects. However, the amended cooperation agreement was executed after Brentwood had entered into all but eight of the dozens of third party construction contracts. Thus, the amended cooperation agreement cannot serve as a reimbursement agreement "under which" Brentwood entered into third party construction contracts on behalf of the RDA.

In addition, the amended cooperation agreement states that it "amends and restates the Cooperation Agreement in its entirety" and "[t]he Cooperation Agreement is of no further force or effect." The PIA's executed shortly after the amended cooperation agreement were under that agreement, not the cooperation agreement. The PIA's themselves refer in their recitals to the amended cooperation agreement and make no mention of the cooperation agreement.

Thus, the cooperation agreement, the resolutions by Brentwood and the RDA funding the five projects, the amended cooperation agreement, and the PIA's do not show a "clear and unequivocal" intention to incorporate each other. (*R.W.L. Enterprises, supra*, 17 Cal.App.5th at p. 1028.) To the contrary, the cooperation agreement makes no

19

reference to any redevelopment projects, which were decades in the future. The resolutions to fund the five projects gave no indication that the cooperation agreement existed. The amended cooperation agreement refers to the long ago cooperation agreement but declares it of no force and effect. Finally, the PIA's refer only to the amended cooperation agreement. If anything, the facts indicate an intention to separate the cooperation agreement in 1981, with its agreement-to-agree provisions, from the amended cooperation agreement and the PIA's in 2011, which set forth the RDA's commitment to reimburse specific projects and costs. These circumstances combined with the sheer passage of time—nearly 30 years from September 1981 when the cooperation agreement was executed to February and March 2011 when the amended cooperation agreement and PIA's were executed—weighs heavily against a finding that the parties intended these documents to be one transaction. (*Id.* at p. 1031.)

Brentwood argues that *Holguin v. Dish Network LLC* (2014) 229 Cal.App.4th 1310, supports its position that these documents constitute one agreement. In *Holguin*, the court found that five written agreements between homeowners and satellite dish programming and installation companies "were part of a single transaction." (*Id.* at p. 1321.) The plaintiffs initiated an order for a bundle of telecommunications services with an order form indicating that service and installation were offered by different but related companies. (*Id.* at pp. 1314-1315, 1320-1321.) The remaining service, residential customer and promotion agreements provided to the plaintiffs during installation some weeks later expressly referenced or incorporated each other. (*Ibid.*) All five agreements concerned a single order for telecommunications services and were executed within weeks of each other. (*Ibid.*) *Holguin* in no way stands as authority for construing the cooperation agreement in 1981, dozens of resolutions from 2007 to 2011, the amended cooperation agreement in 2011, and the PIA's in 2011 as one agreement regarding a single transaction.

20

Even assuming that Civil Code section 1642 applies to an issue of statutory interpretation, Brentwood has failed to show that rejecting the application of that statute was not supported by substantial evidence.

*Ratification*

Alternatively, Brentwood contends "that the PIAs should be construed to include the parties' prior commitments, made under the cooperation agreement and the findings resolutions, because the PIAs expressly ratified those commitments by incorporating them by reference."

Ratification is an agency doctrine. "Ratification is the voluntary election by a person to adopt in some manner as his own an act which was purportedly done on his behalf by another person, the effect of which, as to some or all persons, is to treat the act as if originally authorized by him. [Citations.]" (*Rakestraw v. Rodrigues* (1972) 8 Cal.3d 67, 73 (*Rakestraw*); Civ. Code, § 2307 ["An agency may be created, and an authority may be conferred, by a precedent authorization or a subsequent ratification"]; 3 Witkin, Summary of California Law (11th ed. 2017) Agency and Employment, § 149, pp. 203-204 ["An agent, at the time he or she does an act, may be without authority, actual or ostensible; but the act may be rendered valid and binding on the principal, as of the time the unauthorized act was done, if the principal ratifies and thus gives effect to it"].)

While Brentwood has cited no cases outside of the agency context, older cases have acknowledged that a board of supervisors " 'may cure informalities or irregularities in procedure by a subsequent ratification.' " (*Power v. May* (1896) 114 Cal. 207, 208; *Sittig v. Raney* (1921) 53 Cal.App. 709, 721; *Smeltzer v. Miller* (1899) 125 Cal. 41, 43-44.) Brentwood, however, cites no irregularities in form or procedure pertaining to the cooperation agreement, the findings resolutions, or the PIA's.

Moreover, Brentwood stumbles out of the gate because the PIA's do not incorporate the cooperation agreement by reference, as the city contends. Rather, the

21

PIA's incorporate the amended cooperation agreement only, which post-dated the funding resolutions and third party construction contracts, and declared the cooperation agreement of no force or effect.

The evident purpose of Brentwood's contention that the PIA's ratified the cooperation agreement and the findings resolutions is to relate the PIA's back in time to when the cooperation agreement and the findings resolutions were executed. (*Rakestraw, supra,* 8 Cal.3d at p. 73 ["Generally, the effect of ratification is that the authority which is given to the purported agent relates back to the time when he performed the act"].) Assuming that the PIA's ratified these documents, even though there was no lack of authority or irregularity involved that required ratification on the part of Brentwood and the RDA, the effect of ratification is limited to the terms of the documents ratified. Ratification does not alter the terms of a contract or make a contract with different terms. (*McClintock v. Robinson* (1937) 18 Cal.App.2d 577, 582 (*McClintock*) [where principal authorized agent to purchase a cabin and agent leased the cabin, principal could ratify the lease but not change the contract to a purchase]; see also *Friddle v. Epstein* (1993) 16 Cal.App.4th 1649, 1656 (*Friddle*); 2A C.J.S. (2019 update) Agency, § 84 & fn. 1 ["Ratification by a principal of an unauthorized act of his or her agent neither changes a contract which has been entered by the agent nor makes a new contract with different terms"], citing *McClintock, supra*, 18 Cal.App.2d at p. 582.)

Thus, the cooperation agreement, if ratified by the PIA's, continues to be an agreement-to-agree that does not identify any existing or projected redevelopment projects or any amounts that the former RDA commits to reimburse. The finding resolutions, if ratified, continue to be mere declarations to allow the RDA to fund construction. Ratification does not change the terms of the cooperation agreement or the resolutions. Ratification or not, Brentwood has no "loan agreement" with its former RDA to reimburse the costs of the five projects "under which" Brentwood entered into third party construction contracts.

22

Brentwood cites *Stickel v. Harris* (1987) 196 Cal.App.3d 575, in which the court concluded "that a joint venture could ratify the acts of one of its members even though those actions were taken before the joint venture was even formed." The court analogized the situation to "preincorporation contracts by corporate promoters. If the subsequently formed corporation ratifies such a contract by knowingly accepting its benefits, the promoters' contract becomes an obligation of the corporation and enforceable against it. [Citations.]" (*Id.* at p. 586.) "There is no reason in law or logic why this reasoning should not extend to partnerships and joint ventures." (*Ibid.*)

*Stickel* involved a common application of the doctrine of ratification. (See *02 Development, LLC v. 607 South Park, LLC* (2008) 159 Cal.App.4th 609, 610 ["It is hornbook law that a corporation can enforce preincorporation contracts made in its behalf, as long as the corporation 'has adopted the contract or otherwise succeeded to it.' [Citation]"].) *Stickel* does not stand for the proposition that ratification can alter the terms of the contract ratified. The rule is that an act of ratification adopts the contract as made at the time. (*McClintock, supra*, 18 Cal.App.2d at p. 582; *Friddle, supra*, 16 Cal.App.4th at p. 1656.)

Brentwood's resort to the doctrine of ratification, even if it were applicable, does not transfer the terms of the PIA's to the earlier dates when the cooperation agreement was executed and the resolutions adopted. At best, ratification merely confirms the terms of these documents as written, which does not assist Brentwood in its claim for payment of third party construction contracts.

## DISPOSITION

The judgment is affirmed.  The Department shall recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1) & (2).)

/s/

RAYE, P. J.

We concur:

/s/

ROBIE, J.

/s/

MAURO, J.

Filed 9/9/20

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----


| | |
|---|---|
| CITY OF BRENTWOOD et al., | C086344 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2016-80002498-CU-WM-GDS) |
| v. | |
| DEPARTMENT OF FINANCE et al., | |
| Defendants and Respondents. | |


APPEAL from a judgment of the Superior Court of Sacramento County, Michael P. Kenny, Judge. Affirmed.

Burke, Williams & Sorensen, J. Leah Castella, Megan A. Burke; and Damien Brower, City Attorney, for Plaintiffs and Appellants.

Xavier Becerra, Attorney General, Thomas S. Patterson, Assistant Attorney General, Tamar Pachter and Anna Ferrari, Deputy Attorneys General, for Defendants and Respondents.


1

THE COURT:

The opinion in the above-entitled matter filed August 11, 2020, was not certified for publication in the Official Reports.  For good cause it appears now that the opinion should be published in the Official Reports and it is so ordered.


BY THE COURT:


_____/s/_____
RAYE, P. J.


_____/s/_____
ROBIE, J.


_____/s/_____
MAURO, J.

2