Filed 4/14/23; Modified and Certified for Publication 5/10/23 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF CHULA VISTA et al., | C094237 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2019-80003123-CU-WM-GDS) |
| v. | |
| JOE STEPHENSHAW, as Director, etc., et al., | |
| Defendants and Respondents. | |

This dispute arises out of the 2011 legislation that dissolved California's redevelopment agencies and created a process for winding down their affairs. Here, the Department of Finance (Department) determined that certain reimbursement agreements between the City of Chula Vista (City) and its former redevelopment agency (Agency) were not "enforceable obligations" under the redevelopment dissolution laws. Thus, despite having approved payment under the agreements on prior "recognized obligation payment schedules" (ROPS), the Department denied payment authorization on the fiscal year 2018-2019 and 2019-2020 ROPS.

1

The City and the Chula Vista Redevelopment Successor Agency (Successor Agency) (together, plaintiffs) filed this action seeking to compel the Department to recognize the reimbursement agreements as enforceable obligations and approve the use of property tax revenues for such items on all current and future ROPS.[1] The trial court denied the petition and entered judgment in favor of the Department.

On appeal, plaintiffs argue that the Department erred in rejecting the items as enforceable obligations under section 34171, subdivision (d)(2) of the Health and Safety Code.[2] Alternatively, plaintiffs contend the Department should be estopped from denying the items based on its prior approvals. We conclude that some of the disputed items are enforceable obligations. Thus, we reverse the judgment in part, and remand with directions.

LEGAL BACKGROUND

After World War II, the Legislature passed legislation authorizing the formation of community redevelopment agencies. (*California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 245 (*Matosantos*).) The intent of the "Community Redevelopment Law" (§ 33000 et seq.), as it came to be known, was to help local governments revitalize blighted communities and increase the supply of affordable housing. (*Matosantos, supra*, at pp. 245-246; *Marek v. Napa Community Redevelopment Agency* (1988) 46 Cal.3d 1070, 1082.) To this end, the Community Redevelopment Law endowed redevelopment agencies with "broad powers to acquire property through purchase and condemnation [citation] and to '[make] and execute contracts and other

---

[1] We have substituted Joe Stephenshaw, in his capacity as the Director of the Department, in place of his predecessor, Keely Bosler. Tracy M. Drager, in her capacity as the San Diego County Auditor and Controller, also is a named defendant in this action, but takes no position on appeal.

[2] Undesignated statutory references are to the Health and Safety Code.

2

instruments necessary' to complete redevelopment projects [citation]." (*Marek, supra*, at p. 1082.)

Redevelopment agencies could not levy taxes to finance their activities. Instead, they relied on tax increment financing. Under this funding method, "[t]ax revenues available for local agencies from land within a redevelopment area are frozen as of the date a redevelopment plan is adopted, and any tax revenues generated by an increase in property values after adoption of the plan—the tax increment—are paid to the redevelopment agency for use in financing the redevelopment project." (*City of Cerritos v. Cerritos Taxpayers Assn.* (2010) 183 Cal.App.4th 1417, 1424.) Over time, the tax increment financing system became a source of contention because of the financial advantage it provided to redevelopment agencies and their sponsoring entities relative to school districts and other local agencies. (*Matosantos, supra*, 53 Cal.4th at p. 248; *City of Montclair v. Cohen* (2018) 20 Cal.App.5th 238, 243.)

Consequently, in June of 2011, amidst a state fiscal emergency, the Legislature enacted legislation (Assem. Bill No. 26 (2011-2012 1st Ex. Sess., ch. 5)) to dissolve redevelopment agencies and create a process for the wind down of their affairs. (*Matosantos, supra*, 53 Cal.4th at p. 241.) The California Supreme Court upheld the legislation and it went into full effect on February 1, 2012. (*Id*. at p. 275.) The Legislature subsequently adopted additional legislation—Assembly Bill No. 1484 (2011-2012 Reg. Sess., eff. June 27, 2012), Assembly Bill No. 471 (2013-2014 Reg. Sess., eff. Feb. 18, 2014), and Senate Bill No. 107 (2015-2016 Reg. Sess., eff. Sept. 22, 2015)—to clarify or modify the dissolution and wind down process. (See, e.g., *Cuenca v. Cohen* (2017) 8 Cal.App.5th 200, 211 (*Cuenca*); *City of Grass Valley v. Cohen* (2017) 17 Cal.App.5th 567, 574, 580-581.) Taken together, we shall refer to these laws as the "Dissolution Law."

A primary purpose of the Dissolution Law was to dissolve redevelopment agencies, eliminate tax increment financing, and redirect, to the maximum extent

possible, the revenues and assets of the former redevelopment agencies to local governments to help fund core governmental services. (*Cuenca, supra*, 8 Cal.App.5th at p. 207; *City of Montclair v. Cohen, supra*, 20 Cal.App.5th at p. 251.) However, the Dissolution Law also seeks to ensure that the former redevelopment agencies' existing enforceable obligations would be honored. (*Cuenca*, at p. 207; §§ 34167, subd. (a), 34169, subds. (a) & (b), 34177, subds. (a) & (c).) Thus, as part of the wind down process, the Dissolution Law established "successor agencies" and empowered them to " '[c]ontinue to make payments due for enforceable obligations,' " as defined in the Dissolution Law. (*County of Monterey v. Bosler* (2020) 57 Cal.App.5th 466, 472; §§ 34177, subd. (a), 34171, subd. (d)(1).)

"To obtain funds to make payments required by enforceable obligations, a successor agency must periodically prepare [ROPS] setting forth the minimum payment amounts for each enforceable obligation and identify one or more sources of payment, and submit the ROPS to the oversight board for approval. [Citations.] Following the oversight board's approval, the successor agency must submit the ROPS to the Department for its approval. [Citation.] The Department then makes 'its determination of the enforceable obligations and the amounts and funding sources of the enforceable obligations.' [Citation.]" (*County of Monterey v. Bosler, supra*, 57 Cal.App.5th at p. 472, fn. omitted; §§ 34177, subd. (a), 34179, subd. (h).) The Department's approval of an item in a ROPS allows the successor agency to receive funds from the Redevelopment Property Tax Trust Fund to pay the item. (§§ 34182, 34183.)

FACTUAL AND PROCEDURAL BACKGROUND

In this appeal, plaintiffs challenge the Department's determination that certain items listed on the Successor Agency's ROPS are not "enforceable obligations" under the Dissolution Law. The items in question relate to amounts that the Agency purportedly owed to the City under a lease financing structure for redevelopment projects. In general, the lease financing structure worked as follows: the City would lease an asset that it

4

owned to a finance entity, which would in turn lease the asset back to the City through a sublease. The finance entity would then sell fractional interests in the underlying sublease payments, known as "certificates of participation," to investors. The funds from the sale of the certificates would be used to finance (or refinance) the redevelopment project. In exchange, the Agency promised to reimburse the City for the lease payments used to pay the certificates. In essence, the City borrowed funds from investors to finance the redevelopment project, and the Agency promised to reimburse the City for repaying the investors.

The specific focus of this appeal is the Department's denial of funding for items 6, 7, and 9 on the ROPS covering the periods from July 1, 2018, to June 30, 2019 (ROPS 18-19), and July 1, 2019, to June 30, 2020 (ROPS 19-20). These items involve requests for funding to reimburse the City for lease payments it made in connection with several series of certificates of participation, discussed in more detail below.

A.	*Agreements related to ROPS item 9*

ROPS item 9 relates to a series of certificates of participation issued to finance (or refinance) the construction of redevelopment projects within the Town Centre II redevelopment project area. As we explain below, the original series of certificates were issued in 1987. They were subsequently refunded (refinanced) in 1993, and then refunded (refinanced) again in 2003.

1.	*1987 certificates of participation*

On September 1, 1987, the City, the Agency, and the First Interstate Bank of California (as trustee) entered into two trust agreements to issue certificates of participation to finance/refinance public parking improvements. Under the agreements, the trustee agreed to prepare, execute, and deliver $9,835,000 in "series A" certificates (the 1987-A Certificates) and $6,600,000 in "series B" certificates (the 1987-B Certificates, and, collectively, the 1987 Certificates). Each certificate represented an undivided fractional interest in the lease payments to be paid by the City under a lease

agreement by and between the City and Agency dated September 1, 1987 (the 1987-A Lease), and a first amendment to lease agreement also dated September 1, 1987 (the 1987-B Lease).

In connection with the 1987 Certificates, the City and the Agency also entered into a cooperation and reimbursement agreement dated September 15, 1987 (the 1987 Reimbursement Agreement). The 1987 Reimbursement Agreement obligated the Agency to (1) pay the City $1,077,000 in consideration for two parcels of real property conveyed by the City to the Agency; (2) reimburse the City $1.3 million in consideration for the City agreeing to pay a portion of the 1987-B Lease payments; and (3) reimburse the City for any amounts paid by the City under the 1987-A Lease.

Section 6, subdivision (g) of the 1987 Reimbursement Agreement provides: "Agency agrees to pay and reimburse City for all amounts due to City pursuant to this [agreement] to the extent that property tax increments attributable to the Town Centre II Redevelopment Project are available to Agency for such purpose . . . ; provided, however, that the Agency shall have the sole and exclusive right to pledge any such sources of funds to the repayment of other indebtedness heretofore or hereafter incurred by Agency in carrying out the Town Centre II Redevelopment Plan. In the event of any such pledge, the Agency's obligations hereunder shall be subordinate to the indebtedness which is secured by such pledge."

Due to a drafting error, the 1987 Reimbursement Agreement includes two sections numbered "6." The second section 6 provides: "Although City and Agency recognize that reimbursement of City will take several years and that reimbursement may be made on an irregular basis over a period of time due to the necessity to use tax increment funds to complete other projects within the Project Area, it is the express intent of the parties that the City shall be entitled to reimbursement of all amounts due to City pursuant to this Agreement . . . in order to make the City whole as soon as practically possible."

2. *1993 certificates of participation*

On February 1, 1993, the City, the Agency, and the First Interstate Bank of California (as trustee) entered into a trust agreement to refinance the City's obligations under the 1987-A Lease and associated certificates via the sale of $11,285,000 in new certificates of participation (the 1993-A Certificates). The 1993-A Certificates were secured by lease payments due from the City under a second amendment to lease agreement, dated February 1, 1993 (the 1993-A Lease).

In conjunction with the 1993-A Certificates, the City and the Agency also entered into a first amendment to cooperation and reimbursement agreement (the 1993 Reimbursement Agreement), which amended the 1987 Reimbursement Agreement to replace references to the 1987-A documents with references to the corresponding 1993-A refinancing documents. The terms and conditions of the 1987 Reimbursement Agreement were otherwise unchanged.

On December 1, 1993, the City, the Agency, and the First Interstate Bank of California (as trustee) entered into another trust agreement to issue $3,115,000 in certificates to fund phase two of the Town Centre II improvements (the 1993-B Certificates). The 1993-B Certificates were secured by the lease payments due from the City under a lease agreement dated December 1, 1993 (the 1993-B Lease). There is no evidence of any reimbursement agreement related to the 1993-B Certificates.

3. *2003 certificates of participation*

On June 1, 2003, the City, the Chula Vista Public Financing Authority (a joint powers authority), and the U.S. Bank National Association (as trustee) entered into a trust agreement to sell $11,320,000 in certificates of participation (the 2003 Certificates) for the purpose of (1) prepaying the 1993-A Lease and the 1993-B Lease; (2) refinancing the unpaid amounts on the 1993-A Certificates and the 1993-B Certificates; and (3) prepaying a 1997 equipment lease. The 2003 Certificates were secured by lease payments due from the City under a lease/purchase agreement by and between the City

7

and the Chula Vista Public Financing Authority dated June 1, 2003 (the 2003 Lease). There was no reimbursement agreement or amendment to an existing reimbursement agreement associated with the 2003 Certificates.

B.     *Agreements related to ROPS items 6 and 7*

ROPS items 6 and 7 relate to a series of certificates of participation issued to refinance previously-issued certificates that financed the construction of two projects within the Bayfront/Town Centre I and Towne Centre II redevelopment project areas.

On July 1, 1996, the City, the Association of Bay Area Governments Finance Corporation (ABAG), and the First Trust National Association (as trustee) entered into a trust agreement to issue $4,315,000 in certificates of participation (the 1996 Certificates), secured by lease payments from the City under a lease agreement by and between the City and the ABAG dated July 1, 1996 (the 1996 Lease).

In conjunction with the 1996 Certificates, the City and the Agency entered into a pair of reimbursement agreements under which the Agency agreed to reimburse the City for its lease payments under the 1996 Lease (collectively, the 1996 Reimbursement Agreements). Like the other reimbursement agreements, the 1996 Reimbursement Agreements make the Agency's reimbursement obligation contingent on the availability of tax increment revenues not otherwise "heretofore or hereafter" pledged.

C.     *Contract performance history*

Consistent with the parties' agreements, the City made payments required under the various leases and recorded those payments as debts owed by the Agency to the City. According to the City, during the period from 1996 to 2003, the City paid a total of $3,331,603.22 in connection with the 1996 Certificates, consisting of $2,913,310.48 for the Bayfront/Town Centre I project (ROPS item 6) and $418,292.74 for the Towne Centre II project (ROPS item 7). In addition, during the period from 1999 to 2007, the City paid a total of $12,740,251.19 in connection with the 1993 and 2003 certificates

8

(ROPS item 9), consisting of $1,975,072.53 for the 1993-A Certificates, $7,139,760.64 for the 1993-B Certificates, and $3,625,418.02 for the 2003 Certificates.

Prior to dissolution, the Agency partially repaid some of the outstanding indebtedness owed to the City for its payments on the certificates. All told, the Agency repaid $500,000 (in principal and interest) in connection with the 1996 Certificates (ROPS item 6) and $11,630,000 (in principal and interest) in connection with the 1993 and 2003 certificates (ROPS item 9).[3]

D.     *The Department's ROPS determinations*

The Successor Agency included requests for funding for repayment of the City's lease payments (as ROPS items 6, 7, and 9) on almost every ROPS since the Dissolution Law took effect.[4] The Department approved those funding requests, without comment, through ROPS 16-17 (covering July 1, 2016, to June 30, 2017).

However, when the Successor Agency again requested funding for items 6, 7, and 9 on ROPS 17-18, the Department denied the requests. The Department explained that it was unable to verify the specific amounts owed and therefore denied the items on that basis. The Department also claimed that because the predissolution repayments were contingent on available tax increment revenues, and not made in accordance with a set repayment schedule, it could not verify that any amounts were owed. Notwithstanding

---

[3]     Plaintiffs contend the City received reimbursements related to ROPS item 6 for fiscal years 1996-1997 ($63,362.08) and 1997-1998 ($436,637.92). However, the payments were posted to the City's general ledger in 2010 and 2011. It is somewhat unclear, therefore, whether the payments were made in 2010 and 2011 and retroactively applied to fiscal years 1996-1997 and 1997-1998, or if the payments were made in fiscal years 1996-1997 and 1997-1998 and belatedly posted to the general ledger in 2010 and 2011. This same issue exists with respect to the repayments related to ROPS item 9, all of which were posted to the general ledger in 2010 and 2011.

[4]     The Successor Agency did not expressly request funding for payments related to the 2003 Certificates until ROPS 18-19.

this denial, the Successor Agency continued to include funding requests for items 6, 7, and 9 on succeeding ROPS.

For ROPS 18-19, the Department initially denied funding for items 6, 7, and 9 based on the Agency's inability to establish the outstanding principal amounts due. However, based on documents provided during the meet and confer process, the Department ultimately reversed its position and approved items 6 and 7.[5]

For ROPS 19-20, the Department again denied funding for items 6, 7, and 9. The Department explained that "[a]fter further review," the agreements underlying these items do not qualify as enforceable obligations under the Dissolution Law, and funding should not have been approved for any of the items as part of ROPS 18-19. The Successor Agency disagreed and filed a meet and confer request. Unpersuaded, in May 2019, the Department issued a final determination letter denying funding for all three items.

The Successor Agency again sought funding for items 6, 7, and 9 as part of ROPS 20-21, and the Department again denied those items, referencing its May 2019 denial letter.

E.    *The trial court proceedings*

Plaintiffs filed a petition for writ of mandate and complaint for declaratory and injunctive relief (petition) seeking a writ to compel the Department to approve disputed

---

**5**    The Department adhered to its position that item 9 was not an "enforceable obligation" because (1) the 1993 certificates were refunded; and (2) there was no agreement requiring the Agency to reimburse the City for lease payments made under the 2003 Certificates. The Department explained that item 9 requested funding for lease payments related to the 1993 certificates made by the City from 1993 through 2007. Since the 1993 certificates were refinanced (refunded) in 2003, the Department stated it was "not clear" why the City continued to make lease payments on the 1993 certificates after that date. It was at this point that the City identified an error which resulted in payments on the 2003 Certificates being mislabeled as payments on the 1993 certificates.

item 9 on ROPS 18-19, and disputed items 6, 7, and 9 on ROPS 19-20; a writ to compel the auditor-controller to remit sufficient funding to pay those items; a declaration that items 6, 7, and 9 are enforceable obligations under the Dissolution Law; and an injunction prohibiting the Department from failing to approve items 6, 7, and 9 in future ROPS requests. Plaintiffs alleged that the items qualify as enforceable obligations under sections 34171, 34178, and/or 34191.4 of the Dissolution Law.

The trial court denied the petition, holding that the underlying agreements did not qualify as enforceable obligations. The trial court relied primarily on section 34171, subdivision (d)(2), which generally excludes agreements between a former redevelopment agency and its sponsoring entity (here, the City) from the definition of enforceable obligations. (§ 34171, subd. (d)(2).) Although there is an exception to this rule for an agreement "entered into (A) at the time of issuance, but in no event later than December 31, 2010, of indebtedness obligations, and (B) solely for the purpose of securing or repaying those indebtedness obligations" (*ibid*.), the trial court concluded that none of the relevant reimbursement agreements met these requirements, either because they were not contemporaneous agreements (for item 9) or because they were contingent on tax increment revenues being available (items 6 & 7). The court applied the same reasoning in concluding that the agreements were not enforceable obligations under section 34178, subdivision (b)(1). The court similarly rejected plaintiffs' claim that the reimbursement agreements were enforceable "loan agreements" under section 34191.4, subdivision (b)(2). Finally, the court held that the Department was not estopped from denying items 6, 7, and 9 in ROPS 18-19 and 19-20 based on its earlier approvals.

Plaintiffs filed a timely notice of appeal.

# DISCUSSION

## I

### *Standard of Review*

The issue in this appeal is whether the Department erred in determining that ROPS items 6, 7, and 9 are not enforceable obligations. Although we ordinarily review administrative actions for an abuse of discretion, where, as here, the question is whether the Department correctly interpreted the governing statutes and relevant agreements, the de novo standard of review applies. (*City of Brentwood v. Department of Finance* (2020) 54 Cal.App.5th 418, 428 (*Brentwood II*).)

The fundamental objective of statutory interpretation is to ascertain and effectuate legislative intent. (*Brentwood II, supra*, 54 Cal.App.5th at p. 428.) To do so, we look first to the statutory language itself, giving the words their ordinary and usual meaning, construed in the context of the statute and the overall statutory scheme. (*Ibid*.; *Mejia v. Reed* (2003) 31 Cal.4th 657, 663.) If the statutory language is clear and unambiguous, there is no need for further construction. (*Brentwood II*, at p. 428.) If not, the court may refer to other indicia of legislative intent. (*Ibid*.)

In construing the underlying agreements, we apply well-settled rules of contract interpretation. The fundamental goal is to give effect to the mutual intention of the parties at the time the contract is formed. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264; Civ. Code, § 1636.) " ' " 'Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.]' " ' " (*City of Oakland v. Department of Finance* (2022) 79 Cal.App.5th 431, 444 (*Oakland*).) The words of a contract are to be understood in their "ordinary and popular sense" unless "used by the parties in a technical sense, or unless a special meaning is given to them by usage . . . ." (Civ. Code, § 1644.) If the contractual language is clear and explicit, it governs. (Civ. Code, § 1638.)

12

*ROPS Items 6 and 7*

Plaintiffs argue that the Department erred in determining that the 1996 Reimbursement Agreements underlying ROPS items 6 and 7 did not qualify as enforceable obligations under section 34171, subdivision (d)(2).  We agree.

For purposes of the Dissolution Law, section 34171, subdivision (d)(2) generally provides that the term " 'enforceable obligation' " does not include "any agreements, contracts, or arrangements between the city, county, or city and county that created the redevelopment agency and the former redevelopment agency."  (§ 34171, subd. (d)(2); *City of Grass Valley v. Cohen, supra*, 17 Cal.App.5th at pp. 585-586.)  As we have previously explained, the exclusion of such agreements reflects legislative concern that such agreements often were not the product of "arm's-length negotiations."  (*County of Sonoma v. Cohen* (2015) 235 Cal.App.4th 42, 48.)

The 1996 Reimbursement Agreements are agreements between the Agency and its sponsoring City.  As such, it is undisputed that the agreements are not enforceable obligations unless they fall within an applicable exception.

Plaintiffs contend that the 1996 Reimbursement Agreements qualify as enforceable obligations under the statutory exception for contemporaneous written agreements set forth in section 34171, subdivision (d)(2), which applies to written agreements between a city/county and its former redevelopment agency "entered into (A) at the time of issuance, but in no event later than December 31, 2010, of indebtedness obligations, and (B) solely for the purpose of securing or repaying those indebtedness obligations . . . ."  (§ 34171, subd. (d)(2).)

The Department responds that the 1996 Reimbursement Agreements are not enforceable obligations because they are "contingent" on available tax increment revenues.  The Department claims that a contingent obligation is an "illusory" promise,

and therefore the 1996 Reimbursement Agreements were not entered into " 'for the purpose of securing or repaying' " the debt.  We are not persuaded.

Had the Legislature intended to exclude agreements containing contingent repayment obligations, it presumably would have made this intent explicit in the statute.  It did not.  Instead, the plain text of the statute requires only that the agreement have been entered into (1) at the time of issuance of the debt (and prior to Dec. 31, 2010); and (2) "solely for the purpose of securing or repaying" that debt.  (§ 34171, subd. (d)(2).)  The 1996 Reimbursement Agreements meet these requirements because they are (1) written agreements; (2) entered into at the time the 1996 indebtedness was incurred; (3) for the purpose of securing or repaying that debt.

It is true that the *timing* of the Agency's reimbursement obligation was contingent on unpledged tax increment revenues being available, but the Department has failed to explain why this rendered the repayment obligation illusory.  There is no evidence to suggest that the Agency never would have unpledged tax increment revenues, or that the Agency could have unpledged tax increment revenues and nevertheless refuse to reimburse the City.  To the contrary, the parties expressly agreed that "[i]f the Agency has available Tax Increment Revenues and shall fail to repay the City . . . , then the City . . . shall be entitled to exercise any and all remedies available pursuant to law."  Further, when the City had unpledged tax increment revenues available, it repaid the City.

The evidence shows that the City only agreed to make the payments on the certificates because the Agency promised it would reimburse the City with tax increment revenues when such revenues became available.  In our view, this was the sole purpose of the 1996 Reimbursement Agreements, and the Department has failed to explain what other purpose the reimbursement agreements possibly could have served.

We acknowledge that the Agency had some ability to control the amount of tax increment revenues available by pledging tax increment revenues to the repayment of other indebtedness.  However, we are not convinced that this discretionary power

14

transformed the Agency's repayment obligation into an illusory promise.  It is well settled that an implied covenant of good faith and fair dealing will be imposed to limit a party's discretion when necessary to protect an agreement that otherwise would be rendered illusory and unenforceable.  (*Third Story Music, Inc. v. Waits* (1995) 41 Cal.App.4th 798, 808; *Locke v. Warner Bros.* (1997) 57 Cal.App.4th 354, 367; *Pasadena Live v. City of Pasadena* (2004) 114 Cal.App.4th 1089, 1093.)  Thus, while the Agency had the discretion to pledge tax increment revenues to the repayment of other indebtedness, the implied covenant of good faith and fair dealing obligated the Agency to exercise that discretion honestly and in good faith.  This is enough to avoid finding the contract unenforceable due to an illusory promise.

On this record, we conclude the Department abused its discretion in determining that the 1996 Reimbursement Agreements are not enforceable obligations.

III

*ROPS Item 9*

In ROPS item 9 the Successor Agency requested funds to reimburse the City for lease payments it made in connection with three separate debt instruments:  the 1993-A Certificates, the 1993-B Certificates, and the 2003 Certificates.  The Department denied the request.

Plaintiffs contend the Department erred in denying funding for ROPS item 9.  We agree in part.

To qualify for ROPS funding, the Successor Agency must show that there is an enforceable reimbursement agreement associated with each debt instrument.  Plaintiffs contend the reimbursement agreements underlying ROPS item 9 are enforceable obligations because they fall within the exception for contemporaneous written agreements in section 34171, subdivision (d)(2).  As we explained in the previous section, this exception applies to "written agreements entered into . . . at the time of

15

issuance . . . of indebtedness obligations, and . . . solely for the purpose of securing or repaying those indebtedness obligations . . . ."  (§ 34171, subd. (d)(2).)

The Department and trial court determined that item 9 did not meet the requirements for the exception because there was no contemporaneous reimbursement agreement.  But it is undisputed that the 1993 Reimbursement Agreement was executed contemporaneously with the February 1, 1993 trust agreement and associated 1993-A Certificates.  Thus, the 1993 Reimbursement Agreement satisfies the timing component of the statutory exception.

We reach a different conclusion regarding the 1993-B Certificates and the 2003 Certificates.  As the Department contends, there was no reimbursement agreement (or amendment to an existing reimbursement agreement) executed contemporaneously with the 1993-B Certificates or the 2003 Certificates.  Additionally, we reject plaintiffs' claim that these later debt instruments were somehow "within the scope" of the 1993 Reimbursement Agreement, which, by its terms, applies only to the 1993 series A refinancing documents (i.e., the 1993-A Lease and the 1993-A Certificates).  Accordingly, the Department did not abuse its discretion in denying reimbursement of the lease payments made in connection with those debt instruments.

The Department argues that even if the 1993 Reimbursement Agreement was entered into contemporaneously with the 1993-A Certificates, it is not an enforceable obligation because it is a "contingent" agreement, and therefore was not entered "solely for the purpose of securing or repaying" the underlying indebtedness.  This is the same argument the Department made with respect to ROPS items 6 and 7.  Accordingly, we reject it for the reasons set forth in the preceding section.[6]

---

[6]    In addition to focusing on the contingent nature of the agreement, the Department suggests the agreement was not issued "solely" to secure or repay the indebtedness because it was a "complex arrangement involving a sale of property other than a

16

In sum, we conclude the trial court abused its discretion in concluding that none of the reimbursement agreements underlying ROPS item 9 are enforceable obligations. Payments made by the City under the 1993-A Lease and the 1993-A Certificates are covered by an enforceable reimbursement agreement.

IV

*Estoppel*

In the alternative, plaintiffs argue that the trial court erred in concluding the Department is not estopped from denying ROPS items 6, 7, and 9 due to its approval of those items in prior ROPS. This contention lacks merit.

"Generally, four elements must be present for the doctrine of equitable estoppel to apply. First, the party to be estopped must have been aware of the facts. Second, that party must either intend that its act or omission be acted upon, or must so act that the party asserting estoppel has a right to believe it was intended. Third, the party asserting estoppel must be unaware of the true facts. Fourth, the party asserting estoppel must rely on the other party's conduct, to its detriment. [Citation.]" (*Lusardi Construction Co. v. Aubry* (1992) 1 Cal.4th 976, 994.) "Although estoppel is generally a question of fact, where the facts are undisputed and only one reasonable conclusion can be drawn from them, whether estoppel applies is a question of law. [Citations.]" (*Feduniak v. California Coastal Com.* (2007) 148 Cal.App.4th 1346, 1360.)

Here, the trial court found no basis for estoppel against the Department. We agree. Plaintiffs cannot show that they reasonably relied on the Department's past ROPS approvals because the relevant transactions occurred years before the Department's

---

leasehold, made on separate payments terms." This argument is deemed forfeited because it is insufficiently developed and supported by adequate citations to record. We are not required to search the record to ascertain whether it contains support for plaintiffs' contentions. (*Salas v. Department of Transportation* (2011) 198 Cal.App.4th 1058, 1074.)

17

ROPS determinations.  Additionally, the Department's ROPS determination letters expressly warned plaintiffs that past approval of an item would not prevent the Department from revisiting that item on future ROPS.  Thus, plaintiffs cannot show that they detrimentally relied on the Department's prior ROPS determinations.  (*City of Brentwood v. Campbell* (2015) 237 Cal.App.4th 488, 504-505.)

In any event, " 'a party cannot assert estoppel against a government entity if it would nullify a strong rule of public policy.' " (*Oakland, supra*, 79 Cal.App.5th at p. 451; accord, *Lusardi Construction Co. v. Aubry, supra*, 1 Cal.4th at p. 994.)  That rule applies here to prevent plaintiffs from asserting estoppel based on the Department's previous ROPS determinations.  (*City of Galt v. Cohen* (2017) 12 Cal.App.5th 367, 385; accord, *Legal Aid Society of San Mateo County v. Department of Finance* (2020) 59 Cal.App.5th 166, 191, fn. 12; *Oakland*, at p. 451.)

## DISPOSITION

The judgment is reversed in part and affirmed in part, and the matter is remanded to the trial court with directions to issue a judicial declaration that the repayment obligations to the City embodied in the 1993 Reimbursement Agreement and the 1996 Reimbursement Agreements are enforceable obligations of the former redevelopment agency for purposes of the ROPS; and to issue a petition for writ of mandate compelling the Department to approve items 6, 7, and 9 on ROPS 18-19 and 19-20 to the extent those items seek funding for reimbursement payments under the 1993 Reimbursement Agreement and the 1996 Reimbursement Agreements; and to grant such other relief as

may be appropriate, consistent with the views expressed in this opinion. Costs on appeal are awarded to the plaintiffs. (Cal. Rules of Court, rule 8.278(a)(1).)

                                                                         KRAUSE , J.

We concur:

    MAURO , Acting P. J.

    BOULWARE EURIE , J.

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| CITY OF CHULA VISTA et al., | C094237 |
| Plaintiffs and Appellants, | (Super. Ct. No. 34-2019-80003123-CU-WM-GDS) |
| v. | |
| JOE STEPHENSHAW, as Director, etc., et al., | ORDER MODIFYING OPINION, CERTIFYING OPINION FOR PUBLICATION & DENYING PETITION FOR REHEARING [NO CHANGE IN JUDGMENT] |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Steven M. Gevercer, Judge. Reversed in part and affirmed in part.

Colantuono, Highsmith & Whatley, Holly O. Whatley, Matthew T. Summers and Liliane M. Wyckoff for Plaintiffs and Appellants.

Rob Bonta, Attorney General, Thomas S. Patterson, Assistant Attorney General, R. Matthew Wise and S. Clinton Woods, Deputy Attorneys General, for Defendants and Respondents.

1

THE COURT:

It is ordered that the opinion in the above entitled matter filed on April 14, 2023, be modified as follows:

1.	On page 14, in the paragraph that begins "It is true," delete the last sentence in the paragraph that begins "Further, when the City."  Insert the following sentence in its place:

Further, when the Agency had unpledged tax increment revenues available, it repaid the City.

2.	In footnote 6 on pages 16 and 17, delete the sentence that begins "We are not required."  Insert the following sentence in its place:

We are not required to search the record to ascertain whether it contains support for the Department's contentions.

This modification does not change the judgment.

The opinion in the above entitled matter was not certified for publication in the Official Reports.  For good cause, it now appears that the opinion should be published in the Official Reports, and it is so ordered.

The petition for rehearing is denied.

BY THE COURT:


    MAURO            , Acting P. J.


    KRAUSE          , J.


    BOULWARE EURIE  , J.